# NIXON, ATTORNEY GENERAL OF MISSOURI v. MISSOURI MUNICIPAL LEAGUE ET AL.

No. 02–1238.   Argued January 12, 2004—Decided March 24, 2004*

---

*Together with No. 02–1386, *Federal Communications Commission et al. v. Missouri Municipal League et al.*, and No. 02–1405, *Southwestern Bell Telephone, L. P., fka Southwestern Bell Telephone Co. v. Missouri Municipal League et al.*, also on certiorari to the same court.

126

*Ronald Molteni,* Assistant Attorney General of Missouri, argued the cause for petitioner in No. 02–1238. With him on the briefs were *Jeremiah W. (Jay) Nixon,* Attorney General, *pro se,* and *James R. Layton,* State Solicitor. *James A. Feldman* argued the cause for the federal petitioners in No. 02–1386. With him on the briefs were *Solicitor General Olson, Assistant Attorney General Pate, Deputy Solicitor General Hungar, Catherine G. O'Sullivan, Andrea Limmer, John A. Rogovin,* and *Richard K. Welch. Michael K. Kellogg, Geoffrey M. Klineberg,* and *Sean A. Lev* filed briefs for Southwestern Bell Telephone, L. P., petitioner in No. 02–1405.

*David A. Strauss* argued the cause for Missouri Municipal League et al., respondents in all cases. With him on the brief were *James Baller* and *Richard B. Geltman.*†

JUSTICE SOUTER delivered the opinion of the Court.

Section 101(a) of the Telecommunications Act of 1996, 110 Stat. 70, 47 U. S. C. § 253, authorizes preemption of state and local laws and regulations expressly or effectively "prohibiting the ability of any entity" to provide telecommunications services. The question is whether the class of entities in-

---

†A brief of *amici curiae* urging reversal was filed for the United States Telecom Association et al. by *Andrew G. McBride, Helgi C. Walker, Michael E. Glover, Edward H. Shakin, Michael T. McMenamin, Carrick B. Inabnett, Marc Gary,* and *Dorian S. Denburg.*

Briefs of *amici curiae* urging affirmance were filed for Congressman Rick Boucher, for the town of Abingdon, Virginia, et al., and for Educause by *Steven R. Minor;* for the City of Abilene, Texas, et al. by *Steven A. Porter;* for the Consumer Federation of America by *James N. Horwood* and *Scott H. Strauss;* for the High Tech Broadband Coalition et al. by *Deborah Brand Baum;* for Knology, Inc., by *David O. Stewart* and *Thomas B. Smith;* for Lincoln Electric System by *Scott Gregory Knudson, Douglas L. Curry,* and *William F. Austin;* and for the United Telecom Council by *Jill M. Lyon* and *Brett Kilbourne.*

Briefs of *amici curiae* were filed for the International Municipal Lawyers Association et al. by *Henry W. Underhill, Jr.;* and for Sprint Corp. by *David P. Murray* and *John G. Short.*

cludes the State's own subdivisions, so as to affect the power of States and localities to restrict their own (or their political inferiors') delivery of such services.  We hold it does not.

I

In 1997, the General Assembly of Missouri enacted the statute codified as § 392.410(7) of the State's Revised Statutes:

> "No political subdivision of this state shall provide or offer for sale, either to the public or to a telecommunications provider, a telecommunications service or telecommunications facility used to provide a telecommunications service for which a certificate of service authority is required pursuant to this section."[1]

On July 8, 1998, the municipal respondents, including municipalities, municipal organizations, and municipally owned utilities, petitioned the Federal Communications Commission (FCC or Commission) for an order declaring the state statute unlawful and preempted under 47 U. S. C. § 253:

> "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  § 253(a).

> "If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to

---

[1] The provision is subject to some exceptions not pertinent here, and as originally enacted the law was set to expire in 2002.  The assembly later pushed the expiration date ahead to 2007.  Mo. Rev. Stat. § 392.410(7) (Supp. 2003).

the extent necessary to correct such violation or inconsistency." § 253(d).

After notice and comment, the FCC refused to declare the Missouri statute preempted, *In re Missouri Municipal League,* 16 FCC Rcd. 1157 (2001), relying on its own earlier order resolving a challenge to a comparable Texas law, *In re Public Utility Comm'n of Texas,* 13 FCC Rcd. 3460 (1997), as well as the affirming opinion of the United States Court of Appeals for the District of Columbia Circuit, *Abilene v. FCC,* 164 F. 3d 49 (1999). The agency concluded that "the term 'any entity' in section 253(a) . . . was not intended to include political subdivisions of the state, but rather appears to prohibit restrictions on market entry that apply to independent entities subject to state regulation."[2] 16 FCC Rcd., at 1162. Like the District of Columbia Circuit in *Abilene,* the FCC also adverted to the principle of *Gregory v. Ashcroft,* 501 U. S. 452 (1991), that Congress needs to be clear before it constrains traditional state authority to order its government. 16 FCC Rcd., at 1169. But at the same time the Commission rejected preemption, it also denounced the policy behind the Missouri statute, *id.,* at 1162–1163, and the Commission's order carried two appended statements (one by Chairman William E. Kennard and Commissioner Gloria Tristani, *id.,* at 1172, and one by Commissioner Susan Ness, *id.,* at 1173) to the effect that barring municipalities

---

[2] The line between "political subdivision" and "independent entity" the FCC located by reference to state law. By its terms, the FCC order declined to preempt the statute as it applied to municipally owned utilities not chartered as independent corporations, on the theory that under controlling Missouri law, they were subdivisions of the State. 16 FCC Rcd., at 1158. The Commission implied an opposite view, however, regarding the status, under § 253, of municipal utilities that had been separately chartered. *Ibid.* The question whether § 253 preempts state and municipal regulation of these types of entities is not before us, and we express no view as to its proper resolution.

from providing telecommunications substantially disserved the policy behind the Telecommunications Act.

The municipal respondents appealed to the Eighth Circuit, where a panel unanimously reversed the agency disposition, 299 F. 3d 949 (2002), with the explanation that the plain-vanilla "entity," especially when modified by "any," manifested sufficiently clear congressional attention to governmental entities to get past *Gregory*. 299 F. 3d, at 953–955. The decision put the Eighth Circuit at odds with the District of Columbia Circuit's *Abilene* opinion, and we granted certiorari to resolve the conflict. 539 U. S. 941 (2003). We now reverse.

## II

At the outset, it is well to put aside two considerations that appear in this litigation but fall short of supporting the municipal respondents' hopes for prevailing on their generous conception of preemption under § 253. The first is public policy, on which the respondents have at the least a respectable position, that fencing governmental entities out of the telecommunications business flouts the public interest. There are, of course, arguments on the other side, against government participation: in a business substantially regulated at the state level, regulation can turn into a public provider's weapon against private competitors, see, *e. g.*, Brief for Petitioner Southwestern Bell Telephone, L. P., in No. 02–1405 et al., pp. 17–18; and (if things turn out bad) government utilities that fail leave the taxpayers with the bills. Still, the Chairman of the FCC and Commissioner Tristani minced no words in saying that participation of municipally owned entities in the telecommunications business would "further the goal of the 1996 Act to bring the benefits of competition to all Americans, particularly those who live in small or rural communities in which municipally-owned utilities have great competitive potential." 16 FCC Rcd., at 1172. Commissioner Ness said much the same, and a number of *amicus* briefs in this litigation argue the competitive

advantages of letting municipalities furnish telecommunications services, drawing on the role of government operators in extending the electric power lines early in the last century. Brief for City of Abilene, Texas, et al. as *Amici Curiae* 14–18; Brief for Consumer Federation of America as *Amicus Curiae* 7. As we will try to explain, however, *infra*, at 133–138, it does not follow that preempting state or local barriers to governmental entry into the market would be an effective way to draw municipalities into the business, and in any event the issue here does not turn on the merits of municipal telecommunications services.

The second consideration that fails to answer the question posed in this litigation is the portion of the text that has received great emphasis. The Eighth Circuit trained its analysis on the words "any entity," left undefined by the statute, with much weight being placed on the modifier "any." But concentration on the writing on the page does not produce a persuasive answer here. While an "entity" can be either public or private, compare, *e. g.*, 42 U. S. C. § 9604(k)(1) (2000 ed., Supp. I) (defining "eligible entity" as a state or local government body or its agent) with 26 U. S. C. § 269B(c)(1) (defining "entity" as "any corporation, partnership, trust, association, estate, or other form of carrying on a business or activity"), there is no convention of omitting the modifiers "public and private" when both are meant to be covered. See, *e. g.*, 42 U. S. C. § 2000d–7(a)(2) (exposing States to remedies in antidiscrimination suits comparable to those available "against any public or private entity other than a State"). Nor is coverage of public entities reliably signaled by speaking of "any" entity; "any" can and does mean different things depending upon the setting. Compare, *e. g.*, *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997) (suggesting an expansive meaning of the term "'any other term of imprisonment'" to include state as well as federal sentences), with *Raygor* v. *Regents of Univ. of Minn.*, 534 U. S. 533, 542–546 (2002) (implying a narrow interpretation

of the phrase "'any claim asserted'" so as to exclude certain claims dismissed on Eleventh Amendment grounds). To get at Congress's understanding, what is needed is a broader frame of reference, and in this litigation it helps if we ask how Congress could have envisioned the preemption clause actually working if the FCC applied it at the municipal respondents' urging. See, *e. g., New Jersey Realty Title Ins. Co.* v. *Division of Tax Appeals of N. J.,* 338 U. S. 665, 673 (1950) (enquiring into "the practical operation and effect" of a state tax on federal bonds). We think that the strange and indeterminate results of using federal preemption to free public entities from state or local limitations is the key to understanding that Congress used "any entity" with a limited reference to any private entity when it cast the preemption net.

### III

### A

In familiar instances of regulatory preemption under the Supremacy Clause, a federal measure preempting state regulation in some precinct of economic conduct carried on by a private person or corporation simply leaves the private party free to do anything it chooses consistent with the prevailing federal law. If federal law, say, preempts state regulation of cigarette advertising, a cigarette seller is left free from advertising restrictions imposed by a State, which is left without the power to control on that matter. See, *e. g., Lorillard Tobacco Co.* v. *Reilly,* 533 U. S. 525, 540–553 (2001). On the subject covered, state law just drops out.

But no such simple result would follow from federal preemption meant to unshackle local governments from entrepreneurial limitations. The trouble is that a local government's capacity to enter an economic market turns not only on the effect of straightforward economic regulation below the national level (including outright bans), but on the authority and potential will of governments at the state or local

level to support entry into the market. Preemption of the state advertising restriction freed a seller who otherwise had the legal authority to advertise and the money to do it if that made economic sense. But preempting a ban on government utilities would not accomplish much if the government could not point to some law authorizing it to run a utility in the first place. And preemption would make no difference to anyone if the state regulator were left with control over funding needed for any utility operation and declined to pay for it. In other words, when a government regulates itself (or the subdivision through which it acts) there is no clear distinction between the regulator and the entity regulated. Legal limits on what may be done by the government itself (including its subdivisions) will often be indistinguishable from choices that express what the government wishes to do with the authority and resources it can command. That is why preempting state or local governmental self-regulation (or regulation of political inferiors) would work so differently from preempting regulation of private players that we think it highly unlikely that Congress intended to set off on such uncertain adventures. A few hypotheticals may bring the point home.

## B

Hypotheticals have to rest on some understanding of what § 253 means when it describes subjects of its preemption as laws or regulations that prohibit, expressly or in effect, "the ability of any entity" to provide telecommunications. The reference to "ability" complicates things. In customary usage, we speak simply of prohibiting a natural or legal person from doing something. To speak in terms of prohibiting their ability to provide a service may mean something different: it may mean denying the entity a capacity or authority to act in the first place. But this is not clear, and it is possible that a law prohibiting the ability to provide telecommunications means a law that limits or cuts back on some pre-

existing authority (under a different law) to go into the telecommunications business.

If the scope of law subject to preemption under § 253 has the former, broader, meaning, consider how preemption would apply to a state statute authorizing municipalities to operate specified utilities, to provide water and electricity but nothing else.[3] The enumeration would certainly have the effect of prohibiting a municipally owned and operated electric utility from entering the telecommunications business (as Congress clearly meant private electric companies to be able to do, see S. Rep. No. 103–367, p. 55 (1994)), and its implicit prohibition would thus be open to FCC preemption. But what if the FCC did preempt the restriction? The municipality would be free of the statute, but freedom is not authority, and in the absence of some further, authorizing legislation the municipality would still be powerless to enter the telecommunications business. There is, after all, no argument that the Telecommunications Act of 1996 is itself a source of federal authority granting municipalities local power that state law does not.

Now assume that § 253 has the narrower construction (preempting only laws that restrict authority derived from a different legal source). Consider a State with plenary authority itself, under its constitution, to operate any variety of utility.[4] Assume that its statutes authorized a state-run

---

[3] The hypothetical city, in other words, is "general law" rather than "home rule." See *City of Lockhart* v. *United States*, 460 U. S. 125, 127 (1983) (In contrast to a general law city, a home rule city has state constitutional authority to do whatever is not specifically prohibited by state legislation).

[4] The Court granted certiorari solely to consider whether municipalities are subsumed under the rubric "any entity," and our holding reaches only that question. There is, nevertheless, a logical affinity between the question presented and the hypothetical situation in which a State were to decide, directly or effectively, against its own delivery of telecommunications services.

utility to deliver electric and water services, but drew the line at telecommunications. The restrictive element of that limited authorization would run afoul of § 253 as respondents would construe it. But if, owing to preemption, the state operating utility authority were suddenly free to provide telecommunications and its administrators were raring to enter this new field, where would the necessary capital come from? Surely there is no contention that the Telecommunications Act of 1996 by its own force entails a state agency's entitlement to unappropriated funds from the state treasury, or to the exercise of state bonding authority.

Or take the application of § 253 preemption to municipalities empowered by state law to furnish services generally, but forbidden by a special statute to exercise that power for the purpose of providing telecommunications services. If the special statute were preempted, a municipality in that State would have a real option to enter the telecommunications business if its own legislative arm so chose and funded the venture. But in a State next door where municipalities lacked such general authority, a local authority would not be able to, and the result would be a national crazy quilt. We will presumably get a crazy quilt, of course, as a consequence of state and local political choices arrived at in the absence of any preemption under § 253, but the crazy quilt of this hypothetical would result not from free political choices but from the fortuitous interaction of a federal preemption law with the forms of municipal authorization law.

Finally, consider the result if a State that previously authorized municipalities to operate a number of utilities including telecommunications changed its law by narrowing the range of authorization. Assume that a State once authorized municipalities to furnish water, electric, and communications services, but sometime after the passage of § 253 narrowed the authorization so as to leave municipalities authorized to enter only the water business. The repealing statute would have a prohibitory effect on the prior ability

to deliver telecommunications service and would be subject to preemption. But that would mean that a State that once chose to provide broad municipal authority could not reverse course. A State next door, however, starting with a legal system devoid of any authorization for municipal utility operation, would at the least be free to change its own course by authorizing its municipalities to venture forth. The result, in other words, would be the federal creation of a one-way ratchet. A State or municipality could give the power, but it could not take it away later. Private counterparts could come and go from the market at will, for after any federal preemption they would have a free choice to compete or not to compete in telecommunications; governmental providers could never leave (or, at least, could not leave by a forthright choice to change policy), for the law expressing the government's decision to get out would be preempted.

The municipal respondents' answer to the one-way ratchet, and indeed to a host of the incongruities that would follow from preempting governmental restriction on the exercise of its own power, is to rely on § 253(b), which insulates certain state actions taken "on a competitively neutral basis." Respondents contend that a State or municipality would be able to make a competitively neutral change of mind to leave the telecommunications market after deciding earlier to enter it or authorize entry. Tr. of Oral Arg. 32–33.

But we think this is not much of an answer. The FCC has understood § 253(b) neutrality to require a statute or regulation affecting all types of utilities in like fashion, as a law removing only governmental entities from telecommunications could not be. See, e. g., In re Federal-State Joint Board on Universal Service, 15 FCC Rcd. 15168, 15175–15178, ¶¶ 19–24 (2000) (declaratory ruling). An even more fundamental weakness in respondents' answer is shown in briefs filed by amici City of Abilene and Consumer Federation of America. We have no reason to doubt them when they explain how highly unlikely it is that a state decision to

withdraw would be "neutral" in any sense of the word. There is every reason to expect just the contrary, that legislative choices in this arena would reflect the intent behind the intense lobbying directed to those choices, manifestly intended to impede, not enhance, competition. See, *e. g.*, Chen, Legal Process and Political Economy of Telecommunications Reform, 97 Colum. L. Rev. 835, 866–868 (1997). After all, the notion that the legislative process addressing governmental utility authority is susceptible to capture by competition-averse private utilities is fully consistent with (and one reason for) the FCC's position that statutes like Missouri's disserve the policy objects of the Telecommunications Act of 1996. Given the unlikely application of §253(b) to state or local choices driven by policy, not business failure, the fair conclusion is that §253(a), if read respondents' way, would allow governments to move solely toward authorizing telecommunications operation, with no alternative to reverse course deliberately later on.

In sum, §253 would not work like a normal preemptive statute if it applied to a governmental unit. It would often accomplish nothing, it would treat States differently depending on the formal structures of their laws authorizing municipalities to function, and it would hold out no promise of a national consistency. We think it farfetched that Congress meant §253 to start down such a road in the absence of any clearer signal than the phrase "ability of any entity." See, *e. g., United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 543 (1940) (Court will not construe a statute in a manner that leads to absurd or futile results).

## C

JUSTICE STEVENS contends that in our use of the hypothetical examples to illustrate the implausibility of the municipal respondents' reading of §253, we read the statute in a way that produces anomalous results unnecessarily, whereas a simpler interpretation carrying fewer unhappy

consequences is available. The dissent emphasizes the word "ability" in the phrase "prohibit or has the effect of prohibiting the ability of any entity" to furnish telecommunications. With its focus on this word, the dissent concludes that "§ 253 prohibits States from withdrawing municipalities' preexisting authority to enter the telecommunications business, but does not command that States affirmatively grant either that authority or the means with which to carry it out." *Post*, at 145. Thus, if a State leaves an earlier grant of authority on the books while limiting it with a legislative ban on telecommunications, the new statute would be preempted, and presumably preemption would also defeat a State's attempted withdrawal of municipalities' authority by repealing the preexisting authorization itself.

But on the very next page, JUSTICE STEVENS allows (in the course of disagreeing about the one-way ratchet) that "[a] State may withdraw comprehensive authorization in favor of enumerating specific municipal powers . . . ." *Post*, at 146. It turns out, in other words, that withdrawals of preexisting authority are not (or not inevitably, at any rate) subject to preemption. The dissent goes on to clarify that it means to distinguish between withdrawals of authority that are competitively neutral in the sense of being couched in general terms (and therefore not properly the subject of preemption), and those in which the repealing law expressly targets telecommunications (and therefore properly preempted). "[T]he one thing a State may not do," the dissent explains, "is enact a statute or regulation specifically aimed at preventing municipalities or other entities from providing telecommunications services." *Ibid.* But the practical implication of that interpretation is to read out of § 253 the words "or ha[s] the effect of prohibiting," by which Congress signaled its willingness to preempt laws that produce the unwanted effect, even if they do not advertise their prohibitory agenda on their faces. Even if § 253 permitted such a formalistic distinction between implicit and explicit repeals of

authority, the result would be incoherence of policy; whether the issue is viewed through the lens of preventing anticompetitive action or the lens of state autonomy from federal interference, there is no justification for preempting only those laws that self-consciously interfere with the delivery of telecommunications services. In short, instead of supplying a more straightforward interpretation of § 253, the dissent ends up reading it in a way that disregards its plain language and entails a policy consequence that Congress could not possibly have intended.

## IV

The municipal respondents' position holds sufficient promise of futility and uncertainty to keep us from accepting it, but a complementary principle would bring us to the same conclusion even on the assumption that preemption could operate straightforwardly to provide local choice, as in some instances it might. Preemption would, for example, leave a municipality with a genuine choice to enter the telecommunications business when state law provided general authority and a newly unfettered municipality wished to fund the effort. But the liberating preemption would come only by interposing federal authority between a State and its municipal subdivisions, which our precedents teach, "are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597, 607–608 (1991) (internal quotation marks, citations, and alterations omitted); *Columbus* v. *Ours Garage & Wrecker Service, Inc.*, 536 U. S. 424, 433 (2002). Hence the need to invoke our working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement *Gregory* requires. What we have said al-

ready is enough to show that §253(a) is hardly forthright enough to pass *Gregory:* "ability of any entity" is not limited to one reading, and neither statutory structure nor legislative history points unequivocally to a commitment by Congress to treat governmental telecommunications providers on par with private firms. The want of any "unmistakably clear" statement to that effect, 501 U. S., at 460, would be fatal to respondents' reading.

The judgment of the Court of Appeals for the Eighth Circuit is, accordingly, reversed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I agree with much of the Court's analysis in Parts II and III of its opinion, which demonstrates that reading "any entity" in 47 U. S. C. §253(a) to include political subdivisions of States would have several unhappy consequences. I do not think, however, that the avoidance of unhappy consequences is adequate basis for interpreting a text. Cf. *ante,* at 140 ("The municipal respondents' position holds sufficient promise of futility and uncertainty to keep us from accepting it"). I would instead reverse the Court of Appeals on the ground discussed in Part IV of the Court's opinion: Section 253(a) simply does not provide the clear statement which would be required by *Gregory* v. *Ashcroft,* 501 U. S. 452 (1991), for a statute to limit the power of States to restrict the delivery of telecommunications services by their political subdivisions.

I would not address the additional question whether the statute affects the "power of . . . *localities* to restrict their own (or their political inferiors') delivery" of telecommunications services, *ante,* at 129 (emphasis added), an issue considered and apparently answered negatively by the Court. That question is neither presented by this litigation nor contained within the question on which we granted certiorari.

JUSTICE STEVENS, dissenting.

In the Telecommunications Act of 1996 (1996 Act), Congress created "a new telecommunications regime designed to foster competition in local telephone markets." *Verizon Md. Inc.* v. *Public Serv. Comm'n of Md.*, 535 U. S. 635, 638 (2002). Reasonable minds have differed as to whether municipalities' participation in telecommunications markets serves or disserves the statute's procompetitive goals. On the one hand, some have argued that municipally owned utilities enjoy unfair competitive advantages that will deter entry by private firms and impair the normal development of healthy, competitive markets.[1] On the other hand, members of the Federal Communications Commission (FCC), the regulatory agency charged with implementation of the 1996 Act, have taken the view that municipal entry "would further the goal of the 1996 Act to bring the benefits of competition to all Americans, particularly those who live in small or rural communities in which municipally-owned utilities have great competitive potential."[2] The answer to the question presented in these cases does not, of course, turn on which side has the better view in this policy debate. It turns on whether Congress itself intended to take sides when it passed the 1996 Act.

In § 253 of the Communications Act of 1934, as added by § 101 of the 1996 Act, Congress provided that "[n]o State or

---

[1] See, *e. g.*, Note, Municipal Entry into the Broadband Cable Market: Recognizing the Inequities Inherent in Allowing Publicly Owned Cable Systems to Compete Directly against Private Providers, 95 Nw. U. L. Rev. 1099 (2001).

[2] *In re Missouri Municipal League*, 16 FCC Rcd. 1157, 1172 (2001). Three Commissioners wrote separately to underscore this point. *Ibid.* (statement of Chairman Kennard and Commissioner Tristani) (describing municipally owned utilities as a "promising class of local telecommunications competitors"); *id.*, at 1173 (statement of Commissioner Ness) (noting that "municipal utilities can serve as key players in the effort to bring competition to communities across the country, especially those in rural areas").

local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service,". unless the State or local law is "competitively neutral" and "necessary to . . . protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." 47 U. S. C. §§ 253(a), (b). It is common ground among the parties that Congress intended to include utilities in the category of "entities" protected by § 253. See, e. g., Reply Brief for Federal Petitioners in No. 02–1238 et al., p. 16 ("Congress clearly did intend to preempt state laws that closed the telecommunications market, including those that closed the market to electric or other utilities"). The legislative history of § 253 confirms the point: Congress clearly meant for § 253 to pre-empt "explicit prohibitions on entry by a utility into telecommunications." S. Rep. No. 104–230, p. 127 (1996).

But while petitioners acknowledge the unmistakable clarity of Congress' intent to protect utilities' ability to enter local telephone markets, they contend that Congress' intent to protect the subset of utilities that are owned and operated by municipalities is somehow less than clear. The assertion that Congress could have used the term "any entity" to include utilities generally, but not *municipally owned* utilities, must rest on one of two assumptions: Either Congress was unaware that such utilities exist, or it deliberately ignored their existence when drafting § 253. Both propositions are manifestly implausible, given the sheer number of public utilities in the United States.[3] Indeed, elsewhere in the 1996 Act, Congress narrowed the definition of the word "utility," as used in the Pole Attachments Act, 47 U. S. C. § 224, to

---

[3] For example, as of 2001, there were more than 2,000 publicly owned electric utilities in the United States, compared to just over 230 investor-owned utilities. Am. Public Power Assn., 2003 Annual Directory & Statistical Report 13.

exclude utilities "owned by . . . any State," including its political subdivisions—a clear indication that Congress was aware that many utilities are in fact owned by States and their political subdivisions. §§ 224(a)(1), (a)(3). Moreover, the question of municipal participation in local telephone markets was clearly brought to Congress' attention. In hearings on a predecessor bill, Congress heard from a representative of the American Public Power Association who described public utilities' unique potential to promote competition, particularly in small cities, towns, and rural communities underserved by private companies. Hearings on S. 1822 before the Senate Committee on Commerce, Science, and Transportation, 103d Cong., 2d Sess., 351–360 (1994) (statement of William J. Ray, General Manager, Glasgow Electric Plant Board).[4] In short, there is every reason to suppose that Congress meant precisely what it said: No State or local law shall prohibit or have the effect of prohibiting the ability of *any* entity, public or private, from entering the telecommunications market.

The question that remains is whether reading the statute to give effect to Congress' intent necessarily will produce the absurd results that the Court suggests. *Ante*, at 134–138. "As in all cases[,] our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve." *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 608 (1979). Before nullifying Congress' evident purpose in an effort to avoid hypothetical absurd results, I would first decide whether the statute can reasonably be read so as to avoid such absurdities, without casting aside congressional intent.

---

[4] This testimony prompted the Senate manager of the bill to remark: "I think the rural electric associations, the municipalities, and the investor-owned utilities, are all positioned to make a real contribution in this telecommunications area, and I do think it is important that we make sure we have got the right language to accomplish what we wish accomplished here." Hearings, at 379 (statement of Sen. Lott).

The Court begins its analysis by asking us to imagine how § 253 might apply to "a state statute authorizing municipalities to operate specified utilities, to provide water and electricity but nothing else," or to a State's failure to provide the necessary capital to a state-run utility "raring" to enter the telecommunications market. *Ante,* at 135. Certainly one might plausibly interpret § 253, as the Court does, to forbid States' refusals to provide broader authorization or to provide necessary capital as impermissible prohibitions on entry. And as the Court observes, such an interpretation would undeniably produce absurd results; it would leave covered entities in a kind of legal limbo, armed with a federal-law freedom to enter the market but lacking the state-law power to do so. But we need not—and in my opinion, should not—interpret § 253 in this fashion. We should instead read the statute's reference to state and local laws that "prohibit or have the effect of prohibiting the *ability* of any entity," § 253(a), to enter the telecommunications business to embody an implicit understanding that the only "entities" covered by § 253 are entities otherwise able to enter the business—*i. e.,* entities both authorized to provide telecommunications services and capable of providing such services without the State's direct assistance. In other words, § 253 prohibits States from withdrawing municipalities' pre-existing authority to enter the telecommunications business, but does not command that States affirmatively grant either that authority or the means with which to carry it out.

Of course, the Court asserts that still other absurd results would follow from application of § 253 pre-emption to state laws that withdraw a municipality's pre-existing authority to enter the telecommunications business. But these results are, on closer examination, perhaps not so absurd after all. The Court first contends that reading § 253 in this manner will produce a "national crazy quilt" of public telecommunications authority, where the possibility of municipal participation in the telecommunications market turns on the scope of

the authority each State has already granted to its subdivisions. *Ante,* at 136. But as the Court acknowledges, permitting States such as Missouri to prohibit municipalities from providing telecommunications services hardly will help the cause of national consistency. *Ibid.* That the "crazy quilt" the Court describes is the product of political choices made by Congress rather than state legislatures, see *ibid.,* renders it no more absurd than the "crazy quilt" that will result from leaving the matter of municipal entry entirely to individual States' discretion.

The Court also contends that applying § 253 pre-emption to bar withdrawal of authority to enter the telecommunications market will result in "the federal creation of a one-way ratchet": "A State or municipality could give the power, but it could not take it away later." *Ante,* at 137. But nothing in § 253 prohibits States from scaling back municipalities' authority in a general way. A State may withdraw comprehensive authorization in favor of enumerating specific municipal powers, or even abolish municipalities altogether. Such general withdrawals of authority may very well "have the effect of prohibiting" municipalities' ability to enter the telecommunications market, see *ante,* at 139, just as enforcement of corporate governance and tax laws might "have the effect of prohibiting" other entities' ability to enter. § 253(a). But § 253 clearly does not pre-empt every state law that "has the effect" of restraining entry. It pre-empts only those that constitute *nonneutral* restraints on entry. § 253(b). A general redefinition of municipal authority no more constitutes a prohibited nonneutral restraint on entry than enforcement of other laws of general applicability that, practically speaking, may make it more difficult for certain entities to enter the telecommunications business.

As I read the statute, the one thing a State may not do is enact a statute or regulation specifically aimed at preventing municipalities or other entities from providing telecommunications services. This prohibition would certainly apply to

a law like Missouri's, which "advertise[s] [its] prohibitory agenda on [its] fac[e]." *Ante*, at 139. But it would also apply to a law that accomplished a similar result by other means—for example, a law that permitted only private telecommunications carriers to receive federal universal service support or access to unbundled network elements.[5] As the Court notes, there is little reason to think that legislation that targets municipalities' ability to provide telecommunications services is "'neutral' in any sense of the word," or that it is designed to do anything other than impede competition, rather than enhance it. *Ante*, at 138. To the extent that reading § 253 to forbid such protectionist legislation creates a "one-way ratchet," it is one perfectly consistent with the goal of promoting competition in the telecommunications market, while otherwise preserving States' ability to define the scope of authority held by their political subdivisions.[6]

The Court's concern about hypothetical absurd results is particularly inappropriate because the pre-emptive effect of § 253 is not automatic, but requires the FCC's intervention. § 253(d). Rather than assume that the FCC will apply the

---

[5] The operative distinction for § 253 purposes is thus not between implicit and explicit repeals of authority. See *ante*, at 139–140. It is, rather, the distinction between laws that generally redefine the scope of municipal authority and laws that specifically target municipal authority to enter the telecommunications business, whether by direct prohibition or indirect barriers to entry.

[6] The goal of striking a balance between promoting competition and preserving States' general regulatory authority surely supplies a sufficient justification for "preempting only those laws that self-consciously interfere with the delivery of telecommunications services," rather than all generally applicable laws that might have the practical effect of restraining entry. *Ante*, at 140. But even if, as the Court asserts, there were "no justification" for drawing the line at laws that "self-consciously" interfere with entities' ability to provide telecommunications services, *ibid.*, that surely would not be a valid reason for refusing to allow the FCC to preempt those that do create such an interference. We generally do not refuse to give effect to a statute simply because it "might have gone farther than it did." *Roschen* v. *Ward*, 279 U. S. 337, 339 (1929).

statute improperly, and rather than stretch our imaginations to identify possible problems in cases not before the Court, we should confront the problem presented by the cases at hand and endorse the most reasonable interpretation of the statute that both fulfills Congress' purpose and avoids unnecessary infringement on state prerogatives. I would accordingly affirm the judgment of the Court of Appeals.