Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 8, 2006         Decided March 17, 2006

No. 03-1380

STATE OF NEW YORK, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

CLEAN AIR IMPLEMENTATION PROJECT, ET AL.,
INTERVENORS

———

Consolidated with Nos.
03-1381, 03-1383, 03-1390, 03-1402, 03-1453, 03-1454,
04-1029, 04-1035, 04-1064, 05-1234, 05-1287

———

On Petitions for Review of Final Actions of the
Environmental Protection Agency

———

*J. Jared Snyder*, Assistant Attorney General, Attorney General's Office of the State of New York, argued the cause for

Government Petitioners. With him on the briefs were *Eliot Spitzer*, Attorney General, *Peter Lehner* and *Michael J. Myers*, Assistant Attorneys General, *Bill Lockyer*, Attorney General, Attorney General's Office of the State of California, *Matthew J. Goldman*, Deputy Attorney General, *Richard Blumenthal*, Attorney General, Attorney General's Office of the State of Connecticut, *Kimberly Massicotte* and *Matthew Levine*, Assistant Attorneys General, *M. Jane Brady*, Attorney General, Attorney General's Office of the State of Delaware, *Valerie S. Csizmadia*, Deputy Attorney General, *Lisa Madigan*, Attorney General, Attorney General's Office of the State of Illinois, *Thomas Davis*, Chief, *G. Steven Rowe*, Attorney General, Attorney General's Office of the State of Maine, *Gerald D. Reid*, Assistant Attorney General, *J. Joseph Curran, Jr.*, Attorney General, Attorney General's Office of the State of Maryland, *Kathy M. Kinsey*, Assistant Attorney General, *Thomas F. Reilly*, Attorney General, Attorney General's Office of the Commonwealth of Massachusetts, *James R. Milkey*, Assistant Attorney General, *Kelly A. Ayotte*, Attorney General, Attorney General's Office of the State of New Hampshire, *Maureen D. Smith*, Senior Assistant Attorney General, *Peter C. Harvey*, Attorney General, Attorney General's Office of the State of New Jersey, *Stephanie Brand*, *Kevin Auerbacher*, *Jean Reilly*, and *Ruth Carter*, Assistant Attorneys General, *Patricia A. Madrid*, Attorney General, Attorney General's Office of the State of New Mexico, *Tracy M. Hughes*, General Counsel, *Robert A. Reiley*, Assistant Counsel, Commonwealth of Pennsylvania, Department of Environmental Protection, *Patrick C. Lynch*, Attorney General, Attorney General's Office of the State of Rhode Island, *Tricia K. Jedele*, Special Assistant Attorney General, *William H. Sorrell*, Attorney General, Attorney General's Office of the State of Vermont, *Erick Titrud* and *Kevin O. Leske*, Assistant Attorneys General, *Peggy A. Lautenschlager*, Attorney General, Attorney General's Office of the State of Wisconsin, *Thomas L. Dosch*, Assistant Attorney

General, *Robert J. Spagnoletti*, Attorney General, Attorney General's Office of the District of Columbia, *Edward E. Schwab*, Deputy Attorney General, *Donna M. Murasky*, Senior Litigation Counsel, *Barbara Baird*, District Counsel, South Coast Air Quality Management District, *Daniel C. Esty*, *Christopher P. McCormack*, *Christopher G. King*, Assistant Corporation Counsel, City of New York, *Kristine Poplawski*, Deputy City Attorney, City and County of San Francisco. *John V. Dorsey*, Assistant Attorney General, Attorney General's Office of the State of Maryland, *William L. Pardee*, Assistant Attorney General, Attorney General's Office of the Commonwealth of Massachusetts, *Eric Ames* and *J. Brent Moore*, Attorneys, Attorney General's Office of the State of New Mexico, and *Lisa S. Gelb*, Counsel, City and County of San Francisco, entered appearances.

*Howard I. Fox* argued the cause for Environmental Petitioners and Intervenor. With him on the briefs were *Keri N. Powell*, *John D. Walke*, *Jonathan F. Lewis*, *Ann B. Weeks*, *Leah Walker Casey*, and *Michael D. Fiorentino*. *Blair W. Todt* entered an appearance.

*Richard E. Ayers* was on the brief of *amicus curiae* Calpine Corporation in support of petitioners.

*Hope M. Babcock* was on the brief of *amici curiae* American Thoracic Society, et al. in support of environmental petitioners.

*Victor B. Flatt* was on the brief of *amici curiae* Senator Hillary Rodham Clinton, et al. in support of petitioners.

*Geoffrey M. Klineberg* was on the brief of *amicus curiae* Atlantic Salmon Federation in support of petitioners.

*Angeline Purdy* and *Cynthia J. Morris*, Attorneys, U.S. Department of Justice, argued the cause for respondent. With them on the brief was *John C. Cruden*, Deputy Assistant Attorney General. *Michael B. Heister*, Attorney, and *Carol S. Holmes*, Counsel, U.S. Environmental Protection Agency, entered appearances.

*F. William Brownell* argued the cause for Industry Intervenors in support of respondent. With him on the brief were *William H. Lewis, Jr.*, *Henry V. Nickel*, *Makram B. Jaber*, *David S. Harlow*, *Katherine D. Hodge*, *John L. Wittenborn*, *Leslie Sue Ritts*, *Lorane Hebert*, and *Charles H. Knauss*. *Russell S. Frye* entered an appearance.

*Judith Williams Jagdmann*, Attorney General, Attorney General's Office of the Commonwealth of Virginia, *William E. Thro*, State Solicitor General, *D. Mathias Roussy*, Associate State Solicitor General, *Carl Josephson*, Senior Assistant Attorney General, *Troy King*, Attorney General, Attorney General's Office of the State of Alabama, *Robert D. Tambling*, Assistant Attorney General, *David W. Marquez*, Attorney General, Attorney General's Office of the State of Alaska, *Steven E. Mulder*, Assistant Attorney General, *Mike Beebe*, Attorney General, Attorney General's Office fo the State of Arkansas, *Teresa Marks*, Deputy Attorney General, *Lawrence E. Long*, Attorney General, Attorney General's Office of the State of South Dakota, *Roxanne Giedd*, Deputy Attorney General, *Mark L. Shurtleff*, Attorney General, Attorney General's Office of the State of Utah, *Fred Nelson*, Assistant Attorney General, *Patrick J. Crank*, Attorney General, Attorney General's Office of the State of Wyoming, *Vicci M. Colgan*, Senior Assistant Attorney General, *Phill Kline*, Attorney General, Attorney General's Office of the State of Kansas, *David W. Davies*, Assistant Attorney General, *Jeremiah W. (Jay) Nixon*, Attorney General, Attorney General's Office of the

State of Missouri, *James R. Layton*, State Solicitor, *Jon Bruning*, Attorney General, Attorney General's Office of the State of Nebraska, *Wayne Stenehjem*, Attorney General, Attorney General's Office of the State of North Dakota, and *Lyle G. Witham*, Assistant Attorney General, were on the brief of Intervening States. *Michael R. O'Donnell*, Assistant Attorney General, Attorney General's Office of the State of Wyoming, *R. Craig Kneisel*, Assistant Attorney General, Attorney General's Office of the State of Alabama, *Roger L. Chafee*, Senior Assistant Attorney General, Attorney General's Office of the Commonwealth of Virginia, entered appearances.

*Jim Petro*, Attorney General, Attorney General's Office of the State of Ohio, *Henry McMaster*, Attorney General, Attorney General's Office of the State of South Carolina, *Steve Carter*, Attorney General, Attorney General's Office of the State of Indiana, *Thomas M. Fisher*, Solicitor General, *Valerie Tachtiris*, Deputy Attorney General, and *John J. Bursch* were on the brief of *amici curiae* States of Indiana, Ohio, and South Carolina in support of respondent. *Steven D. Griffin*, Assistant Attorney General, Attorney General's Office of the State of Indiana, entered an appearance.

*Daniel J. Popeo*, *Paul D. Kamenar*, and *Paul M. Seby* were on the brief of *amicus curiae* Washington Legal Foundation in support of respondent.

Before: ROGERS, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In *New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) (*"New York I"*), the court addressed the first of two rules promulgated by the Environmental Protection Agency providing ways for stationary sources of air pollution to avoid

triggering New Source Review ("NSR"). The court upheld in part and vacated in part the first rule. *Id.* at 10-11. We now address the second rule, the Equipment Replacement Provision ("ERP"), which amends the Routine Maintenance, Repair, and Replacement Exclusion ("RMRR") from NSR requirements. Under section 111(a)(4) of the Clean Air Act, 42 U.S.C. § 7411(a)(4), sources that undergo "any physical change" that increases emissions are required to undergo the NSR permitting process. *See also id.* §§ 7501(4)*,* 7479(2)(C)(cross-referencing *id.* § 7411(a)(4)). The exclusion has historically provided that routine maintenance, repair, and replacement do not constitute changes triggering NSR. The ERP both defined and expanded that exclusion. EPA explained:

> [The] rule states categorically that the replacement of components with identical or functionally equivalent components that do not exceed 20% of the replacement value of the process unit and does not change its basic design parameters is not a change and is within the RMRR exclusion.

Equipment Replacement Provision of the Routine Maintenance, Repair and Replacement Exclusion, 68 Fed. Reg. 61,248, 61,270 (Oct. 27, 2003) ("Final Rule"); *see also* 70 Fed. Reg. 33,838 (June 10, 2005)("Reconsideration"). Hence, the ERP would allow sources to avoid NSR when replacing equipment under the twenty-percent cap notwithstanding a resulting increase in emissions. The court stayed the effective date of the ERP on December 24, 2003. We now vacate the ERP because it is contrary to the plain language of section 111(a)(4) of the Act.

The Clean Air Act requires new and modified sources of pollution to undergo NSR, a permitting process that imposes specific pollution control requirements depending upon the

geographic location of the source.[1]  Section 111(a)(4) of the Act describes when a source is to be considered "modified":

> The term "modification" means *any physical change* in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

42 U.S.C. § 7411(a)(4) (emphasis added).  Since the inception of NSR, RMRR has been excluded from the definition of "modification."  *See* 39 Fed. Reg. 42,510, 42,514 (Dec. 5, 1974); 43 Fed. Reg. 26,388, 26,403-04 (June 19, 1978). Heretofore, EPA applied the RMRR exclusion through "a case-by-case determination by weighing the nature, extent, purpose, frequency, and cost of the work as well as other factors to arrive at a common sense finding."  67 Fed. Reg. 80,290, 80,292-93 (Dec. 31, 2002).  Consistent with *Alabama Power Co. v. Costle*, 636 F.2d 323 (D.C. Cir. 1980), which recognized EPA's discretion to exempt from NSR "some emission increases on grounds of *de minimis* or administrative necessity," *id*. at 400,

---

[1]    NSR consists of two programs: prevention of significant deterioration ("PSD") and nonattainment NSR. *See New York I*, 413 F.3d at 11-14.  New and modified sources in attainment areas, i.e., where air quality standards have been met, and in unclassifiable areas are required to follow PSD rules, which means they must obtain a preconstruction permit, prove that the construction will not cause violations of certain air quality standards, and show that their operations are in compliance with the Best Available Control Technology ("BACT") requirements.  *See* 42 U.S.C. § 7475.  In nonattainment areas, i.e., where air quality standards have not been met, new and modified sources are required to obtain preconstruction permits, to offset emissions increases with emissions reductions from other sources in the area, and to install "lowest achievable emissions rate" technology ("LAER").  *See id.* § 7503.

EPA has for over two decades defined the RMRR exclusion as limited to "*de minimis* circumstances." 68 Fed. Reg. at 61,272. The ERP provides a bright-line rule and expands the traditional scope of the RMRR by exempting certain equipment replacements from NSR. *See, e.g.,* 40 C.F.R. § 52.21(cc)(2005).[2]

The government and environmental petitioners contend that the ERP is contrary to the plain text of the Act because the statutory definition of "modification" applies unambiguously to any physical change that increases emissions, necessarily including the emission-increasing equipment replacements excused from NSR by the rule. They maintain that the word "any," when given its natural meaning, requires that the phrase "physical change" be read broadly, such that EPA's attempt to

---

[2] The ERP provides:

> Without regard to other considerations, routine maintenance, repair and replacement includes, but is not limited to, the replacement of any component of a process unit with an identical or functionally equivalent component(s), and maintenance and repair activities that are part of the replacement activity, provided that all of the requirements in paragraphs (cc)(1) through (cc)(3)of this section are met.

40 C.F.R. § 52.21 (cc). Paragraph (cc)(1) establishes that the fixed capital cost of the replacement component cannot exceed twenty percent of the replacement value of the process unit. Paragraph (cc)(2) states that the replacement cannot change the basic design parameters of the process unit. Paragraph (cc)(3) requires that the replacement activity not cause the process unit to exceed any independent, legally enforceable emission limitation. The ERP also amends 40 C.F.R. §§ 51.165, 51.166, and 52.24, but given the similarity of the sections, the court will follow the practice of the parties in citing only section 52.21.

read "physical change" narrowly would relegate the word "any" to an insignificant role.

In evaluating the petitioners' contention, we proceed under the familiar two-part test of *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984). If "Congress has directly spoken to the precise question at issue . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. Only if the statute is silent or ambiguous do we defer to the agency's interpretation, asking "whether [it] is based on a permissible construction of the statute." *Id.* at 843. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id*. at 843 n.9.

The petitioners and EPA agree that the phrase "physical change" is susceptible to multiple meanings, each citing dictionary definitions. However, "the sort of ambiguity giving rise to *Chevron* deference 'is a creature not of definitional possibilities, but of statutory context.'" *American Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005) (quoting *Brown v. Gardner,* 513 U.S. 115, 118 (1994)); *see California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc*., 40 F.3d 146, 152 (7th Cir. 1994). As the parties point out, the ordinary meaning of "physical change" includes activities that "make different in some particular," "make over to a radically different form," or "replace with another or others of the same kind or class." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 373 (1981). To say that it is "physical," in this context, indicates that the change must be "natural or material," rather than "mental, moral, spiritual, or imaginary." *Id.* 1706. The

parties agree that in "[r]eal-world, common-sense usage," 68 Fed. Reg. at 61,271, "physical change" includes equipment replacements. They further agree that the ERP would excuse from NSR requirements certain emission-increasing activities that EPA has historically considered to be "physical changes." *See id.* at 61,270.

The parties' essential disagreement, then, centers on the effect of Congress's decision in defining "modification" to insert the word "any" before "physical change." According to the petitioners, the word "any" means that the phrase "physical change" covers any activity at a source that could be considered a physical change that increases emissions. According to EPA, "any" does nothing to resolve ambiguity in the phrase it modifies. EPA maintains that because "physical change" is "susceptible to multiple meanings," *id.* at 61,271, "identifying activities that are 'changes' for NSR purposes . . . requires an exercise of Agency expertise," "the classic situation in which an agency is accorded deference under *Chevron,*" *id.* at 61,272. Under this approach, once EPA has identified an activity as a "physical change," the word "any" requires that the activity be subject to NSR. We conclude that the differences between the parties' interpretations of the role of the word "any" are resolved by recognizing that "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind,'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997), and that courts must give effect to each word of a statute, *see, e.g., TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Because Congress used the word "any," EPA must apply NSR whenever a source conducts an emission-increasing activity that fits within one of the ordinary meanings of "physical change."

In a series of cases, the Supreme Court has drawn upon the word "any" to give the word it modifies an "expansive meaning"

when there is "no reason to contravene the clause's obvious meaning." *Norfolk S. Rwy. Co. v. Kirby*, 543 U.S. 14, 31-32 (2004); *see also Dep't of Hous. and Urban Dev. v. Rucker*, 535 U.S. 125, 130-31 (2002); *Gonzalez*, 520 U.S. at 5. Indeed, the Court has read the word "any" to signal expansive reach when construing the Clean Air Act. In *Harrison v. PPG Industries, Inc.*, 446 U.S. 578 (1980), the Court resolved a jurisdictional dispute under section 307(b)(1) by interpreting the phrase "any other final action," which the Court "discern[ed to have] no uncertainty." *Id.* at 588. The Court never suggested that the term "final action" was itself devoid of multiple meanings depending on the context, but rather stated that when Congress amended the Act in 1977, "it expanded its ambit to include not simply 'other final action,' but rather '*any* other final action.'" *Id.* at 589. "[I]n the absence of legislative history to the contrary," the Court held that the statutory phrase "must be construed to mean exactly what it says, namely, *any other* final action." *Id.*

Although EPA is correct that the meaning of "any" can differ depending upon the statutory setting, *see Nixon v. Missouri Mun. League*, 541 U.S. 125, 132 (2004), the context of the Clean Air Act warrants no departure from the word's customary effect. Unlike *Nixon*, the question of statutory interpretation here does not arise in a setting in which the Supreme Court has required heightened standards of clarity to avoid upsetting fundamental policies. *See id.* at 132-33, 140-41 (citing *Gregory v. Ashcroft*, 501 U.S. 452 (1991)). EPA points to no "strange and indeterminate results," *id.* at 133, that would emerge from adopting the natural meaning of "any" in section 111(a)(4) of the Act. Given Congress's goal in adopting the 1977 amendments of establishing a balance between economic and environmental interests, *see Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 909-10 (7th Cir. 1990)("*WEPCo*"), it is

hardly "farfetched," *Nixon*, 541 U.S. at 138, for Congress to have intended NSR to apply to any type of physical change that increases emissions. In this context, there is no reason the usual tools of statutory construction should not apply and hence no reason why "any" should not mean "any." Indeed, EPA's interpretation would produce a "strange," if not an "indeterminate," result: a law intended to limit increases in air pollution would allow sources operating below applicable emission limits to increase significantly the pollution they emit without government review.

Even without specific reliance on the effect of "any," this court has construed the definition of "modification" broadly. In *Alabama Power*, the court explained that "the term 'modification' [in section 111(a)(4)] is nowhere limited to physical changes exceeding a certain magnitude." 636 F.2d at 400. Although the legislative history indicated that one Senator intended the term to apply only to "major expansion program[s]," *id.* at 400 n.47, the court observed that "the language of the statute clearly did not enact such limit into law," *id.* at 400. The court further observed that "[i]mplementation of the statute's definition of 'modification' will undoubtedly prove inconvenient and costly to affected industries; but the clear language of the statute unavoidably imposes these costs except for *de minimis* increases." *Id.* More recently, in *New York I*, the court looked to the plain meaning of section 111(a)(4) and the absence of contrary legislative history in holding that even pollution control projects constituted "physical changes." *New York I*, 413 F.3d at 40-42. Likewise, the Seventh Circuit concluded in *WEPCo* that the purposes of the 1977 amendments to the Act required an expansive reading of the plain language of section 111(a)(4). *See WEPCo,* 893 F.2d at 908-10.

EPA's attempt to avoid the persuasive force of these

decisions and to find ambiguity in the phrase "any physical change" fails for a variety of reasons. Even assuming that the decisions construing section 111(a)(4) are not "judicial precedent holding that the statute unambiguously forecloses the agency's interpretation," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 125 S. Ct. 2688, 2700 (2005), *Brand X*, on which EPA principally relies, does not drain those decisions of all precedential value. The fact that previous judicial interpretations of section 111(a)(4) have all reached the conclusion that the text must be read broadly supports the petitioner's argument at *Chevron* step one, particularly because those decisions — both before and after *Chevron* — used language indicating the text was "clear" and "plain." *See New York I*, 413 F.3d at 40; *WEPCo*, 893 F.2d at 907; *Alabama Power*, 636 F.2d at 400.

Even in the absence of such precedent, EPA's approach to interpreting "physical change," as well as a similar approach by industry intervenors that focuses on the thirty-nine words following "any," contravenes several rules of statutory interpretation. EPA's position is that the word "any" does not affect the expansiveness of the phrase "physical change"; it only means that, once the agency defines "change" as broadly or as narrowly as it deems appropriate, everything in the agency-defined category is subject to NSR. To begin, that reading, contrary to "a cardinal principle of statutory construction," would make Congress's use of the word "any" "insignificant" if not "superfluous." *TRW*, 534 U.S. at 31 (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Reading the definition in this way makes the definition function as if the word "any" had been excised from section 111(a)(4); there is virtually no role for "any" to play. Additionally, the approaches of EPA and industry would require Congress to spell out all the applications covered by a definition before a court could conclude that

Congress had directly spoken regarding a particular application, ignoring the fact that a definition, like a general rule, need not list everything it covers. *See NPR v. FCC*, 254 F.3d 226, 229 (D.C. Cir. 2001); *see also Shays v. FEC*, 414 F.3d 76, 108 (D.C. Cir. 2005). EPA's approach would ostensibly require that the definition of "modification" include a phrase such as "regardless of size, cost, frequency, effect," or other distinguishing characteristic. Only in a Humpty Dumpty world[3] would Congress be required to use superfluous words while an agency could ignore an expansive word that Congress did use. We decline to adopt such a world-view.

In contrast, the petitioners' approach, by adopting an expansive reading of the phrase "any physical change," gives natural effect to all the words used by Congress and reflects both their common meanings and Congress's purpose in enacting the 1970 and 1977 amendments. *See New York I*, 413 F.3d at 11-13; *WEPCo*, 893 F.2d at 909. To improve pollution control programs in a manner consistent with the balance struck by Congress in 1977 between "the economic interest in permitting capital improvements to continue and the environmental interest in improving air quality," *Chevron*, 467 U.S. at 851, Congress defined the phrase "physical change" in terms of increases in emissions. After using the word "any" to indicate that "physical change" covered all such activities, and was not left to agency interpretation, Congress limited the scope of "any physical change" to changes that "increase[] the amount of any air pollutant emitted by such source or which result[] in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4). Thus, only physical changes that do not result in

---

[3]  *See TVA v. Hill*, 437 U.S. 153, 173 n.18 (1978) (quoting *Through the Looking Glass, in* THE COMPLETE WORKS OF LEWIS CARROLL 196 (1939)).

emission increases are excused from NSR. Because Congress expressly included one limitation, the court must presume that Congress acted "intentionally and purposely," *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)), when it did not include others. *Cf. New York I*, 413 F.3d at 39. So construed, each word in the phrase "any physical change" has a meaning consonant with congressional intent and the scope of the definitional phrase is limited only by Congress's determination that such changes be linked to emission increases.

The expansiveness of the petitioners' approach does not leave the definition of "any physical change" without limits. The modifier "any" cannot bring an activity that is never considered a "physical change" in ordinary usage within the ambit of NSR. But when Congress places the word "any" before a phrase with several common meanings, the statutory phrase encompasses each of those meanings; the agency may not pick and choose among them. EPA, through its historical practice and its words, has acknowledged that the equipment replacements covered by the ERP are "physical changes" under one of the ordinary meanings of the phrase. *See* 68 Fed. Reg. at 61,271-72. EPA may not choose to exclude that "[r]eal-world, common-sense usage of the word 'change.'" *Id.* at 61,271. Moreover, a physical change is not the sole criterion for triggering NSR under the definition of "modification." The expansive meaning of "any physical change" is strictly limited by the requirement that the change increase emissions. *See* 42 U.S.C. § 7411(a)(4).[4]

---

[4] The court has no occasion to decide whether part replacements or repairs necessarily constitute a "modification" under the definition taken as a whole.

The fact that EPA, through the RMRR exclusion, has historically interpreted "any physical change" to exclude changes of trivial regulatory concern on a *de minimis* rationale, *see Alabama Power*, 636 F.2d at 360-61, does not demonstrate that the meaning of "physical change" is ambiguous. Rather, it reflects an agency's inherent power to overlook "trifling matters," *id*. at 360, a "principle [that] is a cousin of the doctrine that, notwithstanding the 'plain meaning' of a statute, a court must look beyond the words to the purpose of the act where its literal terms lead to 'absurd or futile results,'" *id*. at 360 n.89 (citations omitted). As the Supreme Court has instructed, "the venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992). Reliance on the *de minimis* doctrine invokes congressional intent that agencies diverge from the plain meaning of a statue only so far as is necessary to avoid its futile application. Thus, the court in *Alabama Power* acknowledged that "EPA does have discretion, in administering the statute's 'modification' provision, to exempt from PSD review some emission increases on grounds of *de minimis* or administrative necessity." 636 F.2d at 400. As applied, the court explained that *de minimis* standards served to alleviate "severe" administrative and economic burdens by lifting requirements on "minuscule" emission increases. *See id.* at 405. While the court today expresses no opinion regarding EPA's application of the *de minimis* exception, given the limits on the scope of the *de minimis* doctrine, *see Shays,* 414 F.3d at 113-14, EPA appropriately has not attempted to justify the ERP as an exercise of *de minimis* discretion. As EPA has disclaimed the assertion that its prior expansive interpretations of "any physical change" were "absurd or futile," 70 Fed. Reg. at 33,842, it is in

no position to claim that the ERP is necessary to avoid absurdity.

EPA's remaining arguments also fail to demonstrate that the phrase "any physical change" is ambiguous. The fact that the court concluded that the word "increases" in section 111(a)(4) is ambiguous, *see New York I*, 413 F.3d at 23, does not suggest that the phrase "any physical change" is also ambiguous; unlike the latter, the former is unaccompanied by a qualifier signaling Congress's intent. Congress's use of the word "increases" necessitated further definition regarding rate and measurement for the term to have any contextual meaning. No such further definition of "physical change" is required because Congress's use of the word "any" indicates the intent to cover all of the ordinary meanings of the phrase, as evidenced by EPA's decades-long understanding and practice. Also, because the court in *New York I* rejected industry's contention that Congress ratified the New Source Performance Standards ("NSPS") regulations on "modification" in the 1977 amendments, *see id.* at 19-20, EPA's reliance on its NSPS regulations to demonstrate the ambiguity of "any physical change" is unavailing. As discussed, the early emergence of a RMRR exclusion based on a *de minimis* rationale does not blur the clarity of the phrase "any physical change." To the extent industry intervenors rely on the NSPS regime to reargue their position that "modifications" require an increase in maximum emission rates, that issue was resolved in *New York I*, 413 F.3d at 19-20, 40; *see also New York v. EPA*, 431 F.3d 801, 802-03 (D.C. Cir. 2005) (Williams, J., concurring in denial of rehearing), and is irrelevant because it does not address what constitutes a "physical change."

"Therefore, for EPA to avoid a literal interpretation at *Chevron* step one, it must show either that, as a matter of

historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996).  The discussion in *New York I*, 413 F.3d at 12-13, and *WEPCo*, 893 F.2d at 909 (quoting H.R. REP. NO. 95-294, at 211, (1977), *as reprinted in* 1977 U.S.C.C.A.N. 1077, 1290)), of Congress's basic goals in enacting the 1977 amendments — to intensify the war against air pollution, to establish a permit program that struck a balance between economic and environmental interests, and to stimulate technology to control pollution — demonstrate the futility of EPA's endeavor.  EPA cannot show that historical fact prevents a broad reading of "any physical change" inasmuch as EPA for decades has interpreted that phrase to mean "virtually all changes, even trivial ones, . . . generally interpret[ing] the [RMRR] exclusion as being limited to *de minimis* circumstances."  68 Fed. Reg. at 61,272.

As for logic, EPA cannot show any incoherence in Congress requiring NSR for equipment replacements that increase emissions while allowing replacements that do not increase emissions to avoid NSR.  EPA acknowledges the reasonableness of its past expansive interpretation of "any physical change."  *See id*.; 70 Fed Reg. at 33,842; Respondent's Br. at 29.  To the extent that EPA relies on the argument that allowing ERP projects has the potential to lower overall emissions through increased efficiency even if emissions increase at a source, the court in *New York I* rejected EPA's similar argument in support of an exemption from NSR for pollution control projects.  The court stated that "Congress could reasonably conclude, for example, that tradeoffs between pollutants are difficult to measure, and thus any significant increase in emissions of any pollutant should be subject to NSR."  *New York I*, 413 F.3d at 41.  Absent a showing that the policy demanded by the text

borders on the irrational, EPA may not "avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy." *Engine Mfrs.*, 88 F.3d at 1089.

Likewise, EPA offers no reason to conclude that the structure of the Act supports the conclusion that "any physical change" does not mean what it says. EPA does not address the Act's structure except in defending the reasonableness of the ERP as a policy choice. In that context, EPA points to the Act's "many other systematic air programs," particularly "model market-based programs," as support for its view that economic and environmental interests can be effectively balanced while limiting the application of NSR to existing sources. *See* 70 Fed. Reg. at 33,844. Although EPA might prefer market-based methods of controlling pollution, Congress has chosen a different course with NSR.

Accordingly, we hold that the ERP violates section 111(a)(4) of the Clean Air Act in two respects. First, Congress's use of the word "any" in defining a "modification" means that all types of "physical changes" are covered. Although the phrase "physical change" is susceptible to multiple meanings, the word "any" makes clear that activities within each of the common meanings of the phrase are subject to NSR when the activity results in an emission increase. As Congress limited the broad meaning of "any physical change," directing that only changes that increase emissions will trigger NSR, no other limitation (other than to avoid absurd results) can be implied. The definition of "modification," therefore, does not include only physical changes that are costly or major. Second, Congress defined "modification" in terms of emission increases, but the ERP would allow equipment replacements resulting in non-*de minimis* emission increases to avoid NSR. Therefore,

because it violates the Act, we vacate the ERP.