[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16850

_____

D.C. Docket No. 3:14-cv-00153-TCB


ANDREA GOGEL,

Plaintiff - Appellant,


versus


KIA MOTORS MANUFACTURING OF
GEORGIA, INC.,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 24, 2018)

Before MARTIN, JULIE CARNES and O'SCANNLAIN,[*] Circuit Judges.

MARTIN, Circuit Judge:

---

[*] Honorable Diarmuid F. O'Scannlain, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Before she was fired in 2011, Andrea Gogel was the manager of the Team Relations Department of Kia Motors Manufacturing of Georgia, Inc., a subsidiary of the Korean Kia Motors Corporation.  During her time at Kia, Ms. Gogel heard many complaints about how women and Americans were treated at the Korean-owned company.  She experienced similar treatment herself and, in her view, had been denied a promotion because she is a woman and an American.  Eventually, Ms. Gogel decided to file an EEOC charge about the discrimination she had suffered.

Soon, another Kia employee, an American woman named Diana Ledbetter, filed her own EEOC charge.  After learning of Ms. Ledbetter's charge, Kia came to believe that Ms. Gogel had "encouraged or even solicited" Ms. Ledbetter to file her charge.  Kia says it fired Ms. Gogel for that reason.

Ms. Gogel sued Kia for gender and national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a) & § 2000e-3(a), as well as race and alienage discrimination and retaliation under 42 U.S.C. § 1981.  The District Court granted summary judgment in favor of Kia, and Ms. Gogel appealed.  After careful review, and with the benefit of oral argument, we reverse the District Court as to Ms. Gogel's retaliation claims under Title VII and § 1981 and otherwise affirm its ruling.

2

## I.  Background

In 2008, Kia hired Ms. Gogel as Team Relations Manager for its new plant in West Point, Georgia.[1]  At that time, she reported to Randy Jackson, who was the Director of Human Resources and Administration.  Like Ms. Gogel, the head of Kia's department of Human Resources, Robert Tyler, also reported to Mr. Jackson. There were Korean counterparts, called "coordinators," for each management level positon.  For most of Ms. Gogel's time at Kia, Justin Yoo and Kevin Kim were the Korean coordinators for Team Relations and Human Resources.

The "overall purpose" of the Team Relations department was to "support an environment of positive team relations."  To that end, Ms. Gogel's department was charged with developing policies and standards concerning employee behavior. These policies included harassment policies and an EEOC policy.  Team Relations also helped employees understand "the rules and guidelines of the workplace" by offering training and development to new employees as well as to Kia's suppliers. When Ms. Gogel started with Kia, one of the training programs she taught was about compliance with American employment law, particularly Title VII, for Korean expatriates employed at Kia.

---

[1] Because we hear this appeal following a grant of summary judgment in favor of Kia, we describe the facts of this case viewing the record in the light most favorable to Ms. Gogel.  Essex Ins. Co. v. Barrett Moving & Storage, Inc., 885 F.3d 1292, 1299 (11th Cir. 2018).

Ms. Gogel's department also conducted investigations into policy violations, including attendance issues and allegations of harassment or discrimination. The exact process for these investigations depended on the seniority of the employees involved as well as the severity of the allegations. At the conclusion of an investigation, Ms. Gogel would provide Mr. Jackson with the relevant facts and sometimes a recommendation. The results of an investigation were reviewed by Kia's legal department and Mr. Jackson.

In the fall of 2008, Ms. Gogel received a complaint from Diana Ledbetter, a General Affairs Specialist, about an inappropriate relationship between Ledbetter's supervisor, Ms. Kisha Morris Tarver, and Kia's president, Byung Mo Ahn. Ms. Ledbetter asked to transfer to the Team Relations department because Ledbetter perceived that Ms. Morris was abusing her position without fear of reprisal in light of her relationship with President Ahn. When Ms. Gogel received Ms. Ledbetter's complaint, she approached Mr. Jackson for advice on how to appropriately handle the matter, given President Ahn's senior position and the potential risk the relationship posed to the company. Mr. Jackson told Ms. Gogel she could not investigate Ms. Ledbetter's complaint. Separately, Mr. Kim, one of the Korean coordinators for Ms. Gogel, asked her to investigate how Ms. Morris was treating other people and whether she falsified her time, but asked her to do so without investigating President Ahn. Mr. Kim indicated Ms. Gogel should keep her

investigation "very secret" and not tell Mr. Jackson about it.  Ms. Gogel started gathering the information he requested.  But a few weeks later, Mr. Kim told her "to stop the investigation, [ ] not gather any more information, and destroy all information" she had collected thus far.

Ms. Ledbetter made other complaints about workplace conduct as well.  For example, unlike her male colleagues, she was made to practice saying, "welcome Chairman," while holding flowers to practice greeting visiting male Korean executives.  She was ordered to serve these executives wine and she was called a geisha.  When higher level executives visited from Korea, Ms. Ledbetter was forced to fill in for the normal receptionist because that receptionist was not perceived to be pretty while Ms. Ledbetter was.  From 2008 through 2010, Ms. Gogel and Ms. Ledbetter met several times to discuss these types of complaints.

In early 2009, Kia reorganized its departments to include "Head of Department" ("HOD") designations.  Mr. Tyler was made HOD for his own department (Human Resources) as well as Ms. Gogel's department (Team Relations).  Ms. Gogel was the only woman in a similar management role, and she was the only one of these managers not designated an HOD.   Ms. Gogel complained to Mr. Jackson about not receiving the designation, particularly because all other department heads got it.  Mr. Jackson offered varying explanations for not designating Ms. Gogel HOD.  Sometimes he said the

5

nondesignation was related to the "timing" of Team Relations being made its own department.  But other times he claimed the designation of Mr. Tyler was "automatic."

At first, Ms. Gogel believed Mr. Jackson's explanation that "timing" was the reason she was not promoted.  But Ms. Gogel later concluded she was not promoted because of gender discrimination and her investigation of Ms. Morris's relationship with President Ahn.  As a result of various investigations, including the investigation into Ms. Ledbetter's complaint, Ms. Gogel had observed "some extreme cultural differences between the Korean culture and American culture" including with regard to "standard employment laws."  Ms. Gogel also noticed Mr. Kim's attitude toward her negatively changed following her discontinued investigation into Ms. Morris.  In October 2009, Ms. Gogel met with Mr. Jackson and Mr. Tyler and told them she felt she was treated differently about the award of an HOD designation because of her gender.  She also expressed her view that there was "a gender issue within the company that impacts multiple people within the organization."  In April 2010, Mr. Tyler was promoted to Senior Manager of Human Resources and Team Relations.

Throughout 2010, many American managers expressed concerns about treatment by Korean management.  These concerns included Americans not being given appropriate decision-making authority; not being consulted on issues in their

6

purview; and not having a voice in the company.  Mr. Tyler raised these concerns

with Mr. Jackson, who asked him to gather specific information and examples.

With input from American managers including Ms. Gogel, Mr. Tyler drafted what

became known as the "Report of Concerns."  The Report of Concerns was given

by Mr. Tyler to others at Kia around the end of September 2010.  An early version

of the report referenced the purported relationship between Ms. Morris and

President Ahn.  That portion of the report was removed from a second version in

October 2010.  Ms. Gogel met with Mr. Jackson, Charlie Webb (Kia's legal

counsel), and Mr. Tyler in October to reiterate the concerns she had expressed

since 2009, including President Ahn's relationship with Ms. Morris and the

treatment of women and Americans at Kia.  Within weeks of that meeting, Ms.

Gogel emailed Mr. Jackson, Mr. Webb, and Mr. Tyler expressing her concerns

about how the investigation into the Report of Concerns was conducted and her

disappointment that it had already closed.

On November 10, 2010, Ms. Gogel, without counsel, filed her first charge

against Kia with the EEOC.  Her charge alleged she was not designated HOD due

to discrimination on the basis of gender and national origin.  Ms. Gogel did not tell

Ms. Ledbetter that she had filed this EEOC charge.  Yet Ms. Ledbetter learned of

Ms. Gogel's EEOC charge from other employees.  Around this time, Ms. Gogel

met with Ms. Ledbetter, and they discussed Kia's ability to address employee

concerns about discrimination.  Ms. Ledbetter asked whether Ms. Gogel had retained an attorney to represent her.  Ms. Gogel replied that she hadn't, but that she had chosen one to meet with, and she passed along that attorney's name.

On Friday, December 3, Mr. Webb and Mr. Jackson asked Ms. Gogel to sign a document stating she would "not discuss [her] EEOC charge or similar claims against [Kia] with Team Members and [ ] not use [her] position to solicit or influence Team Members to make claims against [Kia]."  The document also purported to prohibit Ms. Gogel from seeking assistance from other employees in gathering information related to her claim and from accessing files and documents that relate to her claim or similar claims against Kia.  Ms. Gogel initially refused to sign it so that she could discuss it with her counsel.  As a result, she was asked to go home.  On Monday, December 6, she changed her mind, decided to sign the document, and returned to work.

Separately, Mr. Tyler filed an EEOC charge on November 19, making his own allegations of national origin discrimination and retaliation.  Like Ms. Gogel, Kia asked Mr. Tyler to sign a document purporting to limit his ability to solicit others and limit his access to Kia's internal documents, and he did.  Kia ultimately suspended Mr. Tyler on December 16, 2010 and terminated him on January 6, 2011 after an investigation into whether he violated the signed statement by stealing documents.

8

Meanwhile, before she learned of Ms. Gogel and Mr. Tyler's EEOC charges, Ms. Ledbetter arranged to file her own EEOC charge. She had concluded that filing a charge was her "only choice" to get Kia to listen to her. She decided to file her charge on her own without encouragement or solicitation from Ms. Gogel or Mr. Tyler, and she did not tell them about her intent to file the charge. She filed her EEOC charge alleging race, gender, and national origin discrimination on December 10.

Kia received Ms. Ledbetter's EEOC charge on December 23, 2010. Upon receipt of the charge, Mr. Jackson realized and was concerned that Ms. Gogel, Mr. Tyler, and Ms. Ledbetter were all represented by the same law firm. He emailed a coworker, explaining that he was trying to reach President Ahn to provide "an update on Bob [Tyler] and Andrea [Gogel]" because "[i]t looks like Bob and Andrea are recruiting others." At that time, Mr. Jackson's belief that Ms. Gogel and Mr. Tyler had "recruit[ed]" Ms. Ledbetter was based only on observing that all three were represented by the same law firm. This concerned Mr. Jackson because he did not want Ms. Gogel, as the manager of Team Relations, "soliciting and encouraging other people to file lawsuits."

In January 2011, Mr. Jackson and Mr. Webb met with Arthur Williams, who was one of Ms. Gogel's subordinates. Mr. Williams told them that Ms. Ledbetter met with Ms. Gogel and Mr. Tyler a number of times around the date she filed her

9

charge.  He also said Ms. Ledbetter had told him in November 2010 that she, Mr. Tyler, and Ms. Gogel were all filing charges against Kia and all had the same attorney.  Mr. Jackson and Mr. Webb also met with Paul Grimes, another of Ms. Gogel's subordinates, who provided them with similar information about meetings among Ms. Gogel, Ms. Ledbetter, and Mr. Tyler or some combination of the three. Mr. Grimes acknowledged he had no idea what Ms. Ledbetter and Ms. Gogel discussed in those meetings.

On January 7, 2011, Mr. Jackson and Mr. Webb asked Ms. Gogel to meet with them.  During this meeting, Mr. Webb asked Ms. Gogel about Ms. Ledbetter's complaints and the prior investigation of President Ahn and Ms. Morris.  Ms. Gogel explained she intended to investigate the relationship between President Ahn and Ms. Morris, but had been prohibited from doing so.  Later in the meeting, Mr. Webb and Mr. Jackson accused Ms. Gogel of colluding with Ms. Ledbetter to file an EEOC charge.  They asked about her conversations with Ms. Ledbetter and said she violated the "agreement" she signed with Kia on December 6th.  Ms. Gogel denied their accusations, explaining her recent meeting with Ms. Ledbetter was not about EEOC charges and was instead about covering the cafeteria during the winter holidays.  At the conclusion of the meeting, Mr. Jackson said to Mr. Webb, "just to be safe, why don't we go ahead as planned." They then suspended her and instructed security to escort her out of the building.

10

Kia fired Ms. Gogel by letter, sent January 19th.  The letter says Kia fired Ms. Gogel because "one could conclude that [she] encouraged or even solicited [Ms. Ledbetter's] filing of the charge" and that "[a]t the very least, there is an appearance of a conflict of interest."  Mr. Jackson made the decision to fire Ms. Gogel.  He later explained that when he wrote the letter he was "totally convinced" Ms. Gogel "had solicited and encouraged other team members to file a lawsuit against the company."  He considered this conduct to violate Ms. Gogel's job duties as Manager of Team Relations.  In light of this, he "lost total confidence and trust in her to perform . . . job duties that she was hired to do, and [he] could not continue her employment with Kia."

Ms. Ledbetter, who was on maternity leave at the time, heard that Mr. Tyler and Ms. Gogel had been fired.  She called Mr. Williams to ask if she was going to be fired too.  Mr. Williams asked her to meet in person, and they met at a Wal-Mart.  There, Mr. Williams prodded Ms. Ledbetter to admit Ms. Gogel and Mr. Tyler encouraged her to file her EEOC charge.  She refused, explaining this was not true.[2]

---

[2] The following year, Ms. Ledbetter again sought to transfer to a different department.  At the time, her EEOC charge was still pending.  Two Kia employees, including Randy Jackson, told her that if she withdrew her EEOC charge, she would have a better chance of being transferred.  She said she felt like a "black sheep" at Kia while the charge was pending, so she withdrew the charge to "get back in good favor with the company."  Even so, Kia did not grant her the transfer.  Ledbetter resigned in June 2013 after determining she was never going to be allowed to transfer.

The EEOC gave Ms. Gogel notice of her right to sue Kia.  Ms. Gogel later filed her initial complaint in state court alleging discriminatory and retaliatory termination claims under Title VII and 42 U.S.C. § 1981.  After Kia removed the case to federal court, it moved for summary judgment on all claims, and Ms. Gogel filed a cross-motion for summary judgment on her retaliation claims.  The Magistrate Judge issued a report and recommendation that the District Court grant Kia's motion for summary judgment on all counts and deny Ms. Gogel's motion.  Over Ms. Gogel's objections, the District Court adopted the R&R and entered judgment against Ms. Gogel.  The District Court concluded Kia fired her for failing to perform her job duties because she allegedly helped or solicited Ms. Ledbetter in filing her EEOC charge against Kia.

This appeal followed.[3]

## II. Standard of Review

"We review a summary judgment ruling de novo, viewing the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."  Essex Ins., 885 F.3d at 1299 (quotation omitted).  A district court must grant a motion for summary judgment only if "there is no genuine dispute as

---

[3] Before the District Court, Ms. Gogel argued she was discriminated against when Kia did not promote her to Head of Department or Senior Manager.  The District Court found her failure-to-promote claim was barred by the Title VII and § 1981 statutes of limitation.  Ms. Gogel has not challenged those conclusions, so we do not consider this claim on appeal.

to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).

## III. Discussion

Ms. Gogel argues that Kia discriminated against her based on her gender and national origin and in retaliation for engaging in protected activity. See 42 U.S.C. § 2000e-2(a) & § 2000e-3(a); 42 U.S.C. § 1981. We begin with Ms. Gogel's retaliation claims, then turn to her claims of gender and national origin discrimination.

## A.    Retaliation claims

Title VII makes it unlawful for an employer to fire an employee because she "opposed any practice made an unlawful employment practice" under Title VII or because she has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). "To establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam) (quotation omitted). "Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for

13

the adverse employment action." Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009). "After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." Id. Retaliation claims under § 1981 are analyzed under this same framework. Id.

Kia concedes Ms. Gogel can show a prima facie claim of retaliation. It argues its legitimate, nondiscriminatory reason for firing her was its reasonable belief that she encouraged or solicited Ms. Ledbetter to file her EEOC charge rather than refer Ms. Ledbetter's complaint internally. Ms. Gogel says that encouraging or soliciting Ms. Ledbetter to file a charge is protected activity and that firing her for that reason is direct evidence of retaliation. Although she disputes that she "encouraged" or "solicited" Ms. Ledbetter to file her charge, Ms. Gogel admits she provided Ms. Ledbetter with the name of an attorney whom she intended to meet with to discuss her own pending EEOC charge.

Kia acknowledges that in most circumstances assisting a coworker with filing an EEOC charge is protected activity under the opposition clause and that terminating an employee for doing so would be retaliation. See 42 U.S.C. § 2000e-(3)(a) (making it unlawful to fire an employee who "assisted" in a Title VII proceeding); see also, e.g., Hobgood v. Ill. Gaming Bd., 731 F.3d 635, 642 (7th Cir. 2013). But Kia says the manner in which Ms. Gogel encouraged Ms.

14

Ledbetter to file an EEOC charge was unreasonable.  In Kia's view, when a human resource employee like Ms. Gogel helps another employee file a discrimination charge, that conduct is unreasonable and not protected activity.

We have "recognized that some otherwise protected conduct may be so disruptive or inappropriate as to fall outside [Title VII's] protection."  Rollins v. State of Fla. Dep't of Law Enf't, 868 F.2d 397, 401 (11th Cir. 1989) (per curiam). Thus, "to qualify for the protection of the statute, the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable."  Id. (emphasis added).  This Court applies a balancing test on a case-by-case basis to determine whether the manner in which an employee expresses her opposition is reasonable.  Id.  We balance "the purpose of the statute and the need to protect individuals asserting their rights [ ] against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment."  Id.

This Court as well as our predecessor court have used this balancing test in the context of human resource employees who are alleged to have violated their employer's procedures for reporting complaints.  In Whatley v. Metro. Atlanta Rapid Transit Auth., 632 F.2d 1325 (5th Cir. 1980 Unit B)[4], the employer fired a

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

human resource employee who assisted another employee with filing a charge of discrimination with the Urban Mass Transit Administration ("UMTA") and included a request that UMTA investigate the charge. Id. at 1327. This process violated the employer's procedure, which stated it would internally investigate charges before forwarding them to UMTA, allowing the employer to include an endorsement or recommendation to UMTA. Id. The former Fifth Circuit held that the employee was fired for the "manner" in which he had handled the complaint, not for processing it. Id. at 1329. The Court explained that "[f]ailing to follow prescribed administrative procedures is not a statutorily protected activity." Id.

In Hamm v. Members of Bd. of Regents of State of Fla., 708 F.2d 647 (11th Cir. 1983), a human resource employee sued the Florida Board of Regents and various state officials for gender discrimination and retaliation for engaging in protected activities. Id. at 649. Among other things, this employee "releas[ed] investigative reports to the campus newspaper" without prior approval and supplied another employee with information contained in personnel files without permission. Id. at 653. The Hamm Court concluded that "[r]ather than supporting a claim of retaliation, the evidence shows that plaintiff repeatedly chose to work outside the framework [the University of South Florida] was attempting to establish to deal with discrimination claims" and that "[a]n employer may remove an employee from a position similar to that at issue here without violating Title VII

16

based on the manner in which the employee undertakes his or her duties."  Id. (citing Whatley, 632 F.2d at 1329).

However, not all opposition to employment practices by human resource employees is unreasonable.  Indeed, prohibiting all such opposition by human resource employees would be contrary to the text of Title VII.  The statute forbids retaliation against "any . . . employee[]" when that employee has "opposed any practice made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e-3(a).  No doubt, human resource employees count among "any . . . employees," and discriminatory practices aimed even at other employees fall into the broad category of "any practice made an unlawful employment practice."  See id.; see also Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997) ("[T]he adjective 'any' is not ambiguous; it has a well-established meaning. . . . '[A]ny' means all.").  And just like other employees, when human resource employees "support[] other employees in asserting their Title VII rights," they engage in protected activity under Title VII's opposition clause.  Littlejohn v. City of New York, 795 F.3d 297, 318 (2d Cir. 2015) (quotation omitted).  For this reason, in deciding whether a human resource employee's opposition is reasonable, our precedent does not look to the fact that a human resource employee opposes a policy, but rather looks to the manner in which she does it.  See Rollins, 868 F.2d at 401 ("If . . . the manner in which the employee complains is found to be

17

unreasonable, it falls outside the protection of the statute . . . ." (emphasis added));

Whatley, 632 F.2d at 1329 ("[I]t was not the fact that [an equal opportunity compliance officer] filed a complaint for [another employee] but the manner in which he did so that upset his employer." (emphasis added)); see also Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir. 2000) (observing that "the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable").  We therefore employ the same case-by-case balancing test for human resource employees that we use for any other employee, to determine whether the manner of their opposition was reasonable.

The difficulty in this case arises from the idea that human resource employees cannot perform their job duties while supporting their coworkers' oppositional conduct.  But this conflict is overstated.  An employer's desire for a loyal, cooperative, and productive human resource employee can be entirely consistent with the "purpose of the statute and the need to protect individuals asserting their rights."  See Rollins, 868 F.2d at 401.  That's because Title VII emphasizes employers' voluntary compliance, as well as the role human resource employees play in achieving and maintaining compliance.  See Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S. Ct. 1011, 1017 (1974) (explaining that

18

"[c]ooperation and voluntary compliance" are the "preferred means" for achieving the goals of Title VII of the Civil Rights Act of 1964).

That said, if human resource employees consistently worked outside their employer's internal procedures for addressing discrimination complaints, that employer's ability to achieve voluntary compliance with Title VII would be diminished or eliminated. There would be no one to implement its program. See Holden v. Owens-Illinois, Inc., 793 F.2d 745, 753 (6th Cir. 1986) ("In acting like a 'compliance officer,' plaintiff disabled herself from continuing to work with company executives in the voluntary development of affirmative action programs."); Smith v. Singer Co., 650 F.2d 214, 217 (9th Cir. 1981) ("By filing complaints . . . because he disagreed with [his employer's] choice of policies . . . [plaintiff] wholly disabled himself from continuing to represent the company's interests as its liaison with the enforcement agencies, and from continuing to work . . . in the voluntary development of nondiscriminatory hiring programs."). Because of the importance of voluntary compliance, a human resource employee usually furthers the purpose of the statute and the need to protect people asserting their rights by following her employer's procedures. And when a human resource employee handling another employee's complaint deviates from an internal reporting procedure, the manner of the HR employee's actions may be unreasonable. See, e.g., Hamm, 708 F.2d at 654; Whatley, 632 F.2d at 1328–29.

19

But not always.  There are times when an employer's internal procedures are not effective for certain classes of complaints or the complaints of particular people.  See, e.g., Tademy v. Union Pac. Corp., 614 F.3d 1132, 1148 (10th Cir. 2008) (describing repeated failures to investigate complaints of racism in connection with a hostile work environment claim).  A human resource employee who tries to resolve complaints internally but fails due to the inadequacy of her employer's procedures furthers the "purpose of the statute and the need to protect individuals asserting their rights" by going outside the employer's internal procedures.  See Rollins, 868 F.2d at 401.

The extent of the deviation from procedure is also a relevant consideration.  For instance, in Hamm and Whatley, the employees went beyond assisting one other employee with a discrimination charge, by making various public statements and engaging in other insubordinate conduct.  Hamm, 708 F.2d at 652; Whatley, 632 F.2d 1326–27.  And in each case, these violations occurred multiple times.  Hamm, 708 F.2d at 652; Whatley, 632 F.2d 1326–27.

We recognize that deviating from an employer's internal procedures to support another employee's opposition can be a violation of job duties.  This Court has acknowledged that when the manner of an employee's opposition "interferes with the performance of his job," it is often unreasonable.  Rosser v. Laborers' Int'l Union of N. Am., Local No. 438, 616 F.2d 221, 223 (5th Cir. 1980).  But an

20

employer cannot defeat the requirements of Title VII by establishing job duties that are inconsistent with the statute's protections. See DeMasters v. Carilion Clinic, 796 F.3d 409, 422 (4th Cir. 2015) ("Nothing in the language of Title VII indicates that the statutory protection accorded an employee's oppositional conduct turns on the employee's job description . . . ."). Thus, while their actions opposing discriminatory practices must be reasonable, human resource employees are not compelled to "take the pro-employer side" when another employee complains of discrimination. See id. at 413 (internal quotation omitted). Instead, Title VII protects human resource employees when they "support[] other employees in asserting their Title VII rights," Littlejohn, 795 F.3d at 318 (quotation omitted), and the manner of their support is reasonable, Rollins, 868 F.2d at 401. This Circuit's test has always sought to balance achieving the purposes of Title VII with avoiding workplace disruption. See Rollins, 868 F.2d at 401. In the case of human resource employees, sometimes striking that balance will require accepting an employee's opposition to discrimination as protected activity where the employee has stepped outside the bounds of work rules to do so.

Viewing this record in the light most favorable to Ms. Gogel, we conclude the manner of her opposition was reasonable. As we see it, Ms. Gogel provided Ms. Ledbetter with the name of an attorney whom she was considering hiring for her own EEOC charge. When Mr. Jackson realized Ms. Gogel and Ms. Ledbetter

21

were represented by the same counsel, he feared Ms. Gogel had solicited and encouraged Ms. Ledbetter to file her charge and fired her for that reason.  Were it not for Ms. Gogel's position as a human resource manager, her action of providing the name of an attorney in connection with her EEOC charge would be protected opposition conduct, because it assisted Ms. Ledbetter with filing her own charge. See Hobgood, 731 F.3d at 642–43.  The only reason Ms. Gogel's opposition might be considered unreasonable stems from her position as a human resource employee and corresponding job duty to follow the company's reporting procedures.  But for purposes of this Court's determination about whether the manner of Ms. Gogel's opposition was "reasonable," that job duty is not paramount.  As we explain, Ms. Gogel's conduct was reasonable here.

Ms. Gogel repeatedly followed Kia policy in notifying Mr. Jackson of her complaints of sexism.  However, he dismissed her complaints as mere "opinion" and conducted no investigation.  And after Ms. Gogel met with Mr. Jackson, Mr. Webb, and Mr. Tyler to reiterate her concerns of sexism, Mr. Jackson ended the meeting, forbade Mr. Tyler from investigating the complaints, and then terminated the investigation without conducting any of his own fact-finding.  Mr. Tyler's experience was similar: after he submitted his Report of Concerns, no real change occurred.  Instead, President Ahn berated the American workers for complaining about working conditions.

22

Most important is how Ms. Gogel and Kia responded to Ms. Ledbetter's complaints. Ms. Ledbetter repeatedly complained to Ms. Gogel regarding the work environment created as a result of her supervisor's relationship with President Ahn. In addressing Ms. Ledbetter's complaint, Ms. Gogel tried to use Kia's internal framework, but Mr. Jackson forbade Ms. Gogel from investigating. And soon after she was secretly authorized by Mr. Kim to conduct an investigation into the relationship, he told her to stop the investigation and destroy any notes that she had taken. When Ms. Ledbetter complained more generally about sexism in her department—whether being forced to practice greeting male executives, pour wine for them, or being called a geisha, and Mr. Tyler relayed those complaints, Mr. Jackson refused to do anything. As with Ms. Gogel's complaints, Mr. Jackson dismissed the reports as mere "opinion." Critically, once Mr. Jackson decided a matter was unworthy of investigation or corrective action, Kia's internal framework was exhausted. Indeed, Mr. Williams—who had been Ms. Gogel's subordinate and was promoted to her position after her termination—testified that if Mr. Jackson "told [him] no, or something . . . that's the answer."

Thus, Ms. Gogel tried to use Kia's internal reporting framework for years, and only gave Ms. Ledbetter the name of an attorney after Kia's framework had proven insufficient to handle Ms. Ledbetter's complaints. Because Ms. Gogel tried to use Kia's internal framework, her deviation from it furthered the purposes of

23

Title VII, without impacting Kia's illusory efforts at voluntary compliance.  Thus, applying the balancing test established in Rollins, and viewing the evidence in the light most favorable to Ms. Gogel, we conclude that the manner of her opposition was reasonable and her conduct was protected activity.

Kia argues that finding the manner of Ms. Gogel's opposition reasonable conflicts with the Fifth Circuit's decision in Jones v. Flagship Int'l, 793 F.2d 714 (5th Cir. 1986).  In Jones, an in-house counsel whose duties included investigating discrimination charges and representing her employer before state and federal administrative agencies sued her employer for gender discrimination under Title VII and for violations of the Equal Pay Act.  Id. at 716.  After a trial, the District Court entered judgment in favor of the employer.  Id. at 718.  On appeal, the Fifth Circuit applied its balancing test, focusing on three actions it concluded "critically harmed Flagship's posture in the defense of discrimination suits brought against the company."  Id. at 728.  Those were Jones's actions in "(1) filing a discrimination suit against Flagship, (2) suggesting that a class action suit would follow, and (3) soliciting or inviting others to sue or join in a suit against the company."  Id.  The Fifth Circuit concluded this conduct was not protected opposition and provided a legitimate nondiscriminatory reason to fire Jones.  Id.

Jones is easily distinguished from this case.  Ms. Gogel was not the in-house legal counsel charged with directing EEOC investigations and representing Kia

24

before the EEOC.  Also, Ms. Gogel never indicated she planned to file a class action on behalf of other Kia employees.  At most, Kia believed Ms. Gogel had encouraged one or two people to file a charge.

Rather than consider the reasonableness of a human resource employee's support for another employee's opposition, the dissent would rule that a human resource employee's "act of soliciting another employee to file a claim—when that action violates an essential duty of an employee's job—is per se unreasonable." Dissent at 46.  The dissent says this rule is necessary because of the potential adverse consequences for employers, and it calls our opinion "a landmine . . . now laid for employers."  Id. at 46–48.

However, the dissent fails to explain how its per se rule could be consistent with the opposition clause of Title VII, which contains no exception for human resource employees.  See 42 U.S.C. § 2000e-(3)(a).  In effect, the dissent would reinterpret the opposition clause to avoid what it sees as negative consequences for employers.  See Dissent at 46–47.  But "the avoidance of unhappy consequences is [not an] adequate basis for interpreting" the opposition clause, see Nixon v. Mo. Mun. League, 541 U.S. 125, 141, 124 S. Ct. 1555, 1566 (2004) (Scalia, J., concurring in judgment), and the dissent's per se rule cannot be reconciled with the statute.  See  DeMasters, 796 F.3d at 422; Littlejohn, 795 F.3d at 318.  The dissent also says our ruling will lead to inadministrable line-drawing problems.  Dissent at

25

46–47. But our holding is consistent with this court's precedent, which has always required the "determination of reasonableness [be] made on a case by case basis by balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." Rollins, 868 F.2d at 401. We therefore doubt this opinion will lead to the problems the dissent describes.

Viewing the evidence in the light most favorable to Ms. Gogel, the record shows that Kia fired her for engaging in protected opposition activity, which she carried out in a reasonable manner. We therefore reverse the District Court's grant of summary judgment on Ms. Gogel's retaliation claims under Title VII and § 1981.

## B.    Gender and National Origin Discrimination Claims

In addition to her retaliation claims, Ms. Gogel also argues that she was terminated in violation of Title VII based on her gender and national origin. See 42 U.S.C. § 2000e-2(a)(1). Ms. Gogel's claims of gender and national origin discrimination are based on circumstantial evidence. This Court primarily uses the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), to evaluate discrimination claims based on circumstantial evidence at summary judgment. Quigg v. Thomas Cty. Sch. Dist.,

26

814 F.3d 1227, 1237 (11th Cir. 2016).  "Under [the McDonnell Douglas] framework, the employee first must show a prima facie case of discrimination. Then, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Finally, the employee has to show that the proffered reason is mere pretext."  Id. (citations omitted).

Again here, Kia does not contest that Ms. Gogel established a prima facie case of discrimination as it relates to her termination.  At step two, however, Kia argued that its nondiscriminatory reason for firing her was the previously discussed perceived encouragement and solicitation of Ms. Ledbetter to file an EEOC charge. Ms. Gogel argues this reason is pretextual and that the real reason was gender and national origin discrimination and retaliation for protected activity.

There is evidence that Ms. Gogel suffered discrimination based on her gender and national origin during her employment at Kia.  But there is no evidence suggesting that discrimination formed a basis for her termination.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004).  Rather, the record strongly indicates that Kia fired Ms. Gogel for assisting Ms. Ledbetter with her charge.  Although this evidence supports Ms. Gogel's retaliation claims, none of it shows the real reason for her firing was gender or national origin discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752

27

(1993).  As a result, we affirm the grant of summary judgment on Ms. Gogel's

Title VII claims for gender and national origin discrimination.

To the extent Ms. Gogel is still pressing her race and alienage discrimination

claims under 42 U.S.C. § 1981, we also affirm the District Court's ruling on those

claims for the same reason.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318,

1330 (11th Cir. 1998) (analyzing § 1981 discrimination claims and Title VII

discrimination claims together because these statutes "have the same requirements

of proof and use the same analytical framework").

## IV.    Conclusion

We affirm the grant of summary judgment on Ms. Gogel's claims of sex and

national origin discrimination under Title VII and § 1981.  But we reverse the grant

of summary judgment on Ms. Gogel's retaliation claims under 42 U.S.C. § 2000e-

3(a) and 42 U.S.C. § 1981.

**AFFIRMED IN PART AND REVERSED IN PART**.

JULIE CARNES, Circuit Judge, dissenting in part and concurring in part:

As Senior Team Relations[1] Manager for Kia, one of Tina Gogel's essential job duties was to try to protect Kia from litigation by working to resolve internally discrimination complaints made by employees.  She was fired by Kia when officials received information indicating that, in contravention of this responsibility, Gogel was actually—and clandestinely—trying to drum up lawsuits against the company.  Specifically, Kia officials concluded that Gogel had encouraged and solicited another employee, Diana Ledbetter, to pursue an EEOC charge against Kia, and had referred that employee to Gogel's own attorney to assist in filing that charge.  As a result of this discovery, Kia officials understandably decided that they could no longer trust Gogel to perform the duties for which she was being paid, and they feared future and continued treachery on her part as a senior manager in a highly significant and sensitive position.  Thus, they fired her.

Nonetheless, the majority holds that Kia was prevented from taking any adverse action against Gogel because her actions constituted opposition to perceived discrimination and were therefore protected under Title VII's anti-retaliation provision.  I respectfully, but strongly, disagree.  Under our precedent, an employee's "opposition-conduct" is not protected when the means by which she

---

[1]  Kia uses the term "Team Members" in lieu of the term "employees."  Thus, to translate, Gogel functioned as the senior manager for employee relations.

expresses that opposition "so interferes with the performance" of her job duties "that it renders [her] ineffective in the position for which [she] was employed." *Rosser v. Laborers' Int'l Union of N. Am.*, *Local No. 438*, 616 F.2d 221, 223 (5th Cir. 1980).[2]

It is hard to argue that a high-ranking manager whose job duties include working to resolve employee disputes without litigation can be effective in that position if she instead solicits subordinates to sue the company. I therefore dissent as to the majority's reversal of the district court's grant of summary judgment to Kia on the retaliation claim.[3] I explain why.

## I.    Kia's Reasonable, Good Faith Belief That Gogel Had Solicited a Subordinate to Sue the Company

On November 10, 2010, Gogel filed a charge of discrimination against Kia with the EEOC alleging discrimination based on her sex and national origin because her position as manager of the Team Relations unit had not been upgraded to a head of department designation. On November 19, 2010, Robert Tyler, the human resources official to whom Gogel directly reported, filed his own charge

---

[2] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[3] The majority affirms the district court's grant of summary judgment to Kia on Gogel's Title VII claims alleging gender and national-origin discrimination. I concur with the majority's analysis and ruling on these claims.

with the EEOC alleging discrimination based on national origin and retaliation. Gogel and Tyler used the same attorney to file their charges.

Kia officials did not retaliate in any way against Gogel or Tyler for their filing of these charges.[4]  But given the sensitivity and influence of the positions of these two high-ranking managers, on December 3, Kia requested that each sign a document agreeing (1) not to discuss his or her EEOC charge or similar claims against Kia with other employees ("Team Members") nor to "use [his or her] position to solicit or influence Team Members to make claims against [Kia]; (2) not to create a conflict of interest for another employee by seeking his assistance in any fact-finding or information gathering related to Gogel or Tyler's claims against Kia; (3) not to make any statements, written or verbal, to another employee "that malign the company"; and (4) not to seek access to any files or documents that relate in any way to the merits of Gogel or Tyler's claims against Kia.  (emphasis added).

Gogel initially refused to sign the document, and was placed on administrative leave.  A few days later, she relented and was allowed to return to work.  Tyler immediately signed the document.  But, thereafter, on two separate occasions, he violated the agreement, downloading dozens of documents.  *See*

---

[4]  To the contrary, on December 22, 2010, Kia gave Gogel a $12,000 discretionary bonus and she was told she was doing a good job; earlier, on December 16, Kia granted Gogel's request for four days paid-leave.

*Tyler v. Kia Motors Mfg. Georgia, Inc.*, 702 F. App'x 945, 948 (11th Cir. 2017);

*Tyler v. Kia Motors Mfg. Georgia, Inc.*, 2016 WL 9663168, at **8–9 (N.D. Ga.

Aug. 1, 2016).  On December 16, 2010, Kia initiated an investigation into Tyler's

computer activities, learning that in the last several months, as well as since the

agreement, Tyler had forwarded hundreds of emails from Kia networks to his

personal email accounts.  *Tyler*, 2016 WL 9663168, at *9.  Kia suspended Tyler

and ultimately terminated him on January 6, 2011, stating in the termination letter

that Kia "ha[d] lost confidence in [his] trustworthiness and therefore, [Kia] ha[d]

no alternative but to discharge [him] immediately."[5]  *Id.*

In the meantime, on December 10, 2010, Diana Ledbetter, an employee on

the General Affairs team, filed her own EEOC charge alleging discrimination by

Kia, with her allegation focused largely on an alleged romantic affair between the

president of the company and a subordinate, among other conduct that she believed

to be sexist.  Randy Jackson, the Director of Human Resources, received notice of

that charge on December 23.  Following so closely on the heels of Gogel and

Tyler's charge, Jackson immediately found it noteworthy that Ledbetter was

represented by the same law firm that Gogel and Tyler used in filing their own

---

[5] Tyler subsequently sued, alleging retaliatory termination in violation of Title VII and § 1981. The district court granted summary judgment to Kia.  On appeal, we affirmed the grant of summary judgment concluding that even though Tyler's prior complaints to Kia about perceived discriminatory actions by the latter constituted protected activity, his violation of the confidentiality agreement constituted a neutral, non-discriminatory reason for terminating him, and Tyler had failed to show that this ground was pretextual. *Tyler v. Kia Motors Mfg. Georgia, Inc.*, 702 F. App'x 945, 949–52 (11th Cir. 2017).

32

charges:  the Atlanta law firm of Barrett & Farahany.  Jackson contacted the company's president and disclosed Jackson's fear that Gogel (and Tyler) were recruiting other employees to sue the company:  a concern to Jackson because as manager of the Team Relations group, Gogel was "paid to prevent lawsuits," not to solicit or encourage other people to sue the company.

During a subsequent investigation into whether Gogel had encouraged Ledbetter to file a charge, Jackson's suspicions were confirmed.  He heard from two subordinates who directly reported to Gogel:  Arthur Williams and Paul Grimes.  Williams reported that Ledbetter had stated to him on multiple occasions during the fall that she, Gogel, and Tyler were "working together" to sue the company and that they would be using the same attorney.  Significantly, Ledbetter had indicated that Gogel "was the leader."  In fact, it was from Ledbetter that Williams first learned that his boss, Gogel, had filed a charge.  In addition, Williams reported that Gogel and Tyler had had "repeated meetings" with Ledbetter and that both had indicated that they "hated" the Koreans.  Paul Grimes likewise confirmed during a meeting with Jackson that Grimes believed Gogel and Ledbetter were collaborating to prepare a lawsuit against Kia, and that, like Williams, Grimes had seen Gogel, Tyler, and Ledbetter meeting frequently. Grimes further testified that he believed, based on their comments, that Gogel and Tyler hated the Koreans.

After this investigation, Jackson spoke to Gogel about his concern that she had encouraged Ledbetter to sue the company. Gogel denied having any significant recent interactions with Ledbetter. Instead, she indicated that her recent conversations with Ledbetter concerned only operational issues, such as cafeteria coverage during the upcoming plant shutdown and a misunderstanding about food service.

Shortly thereafter, Kia terminated Gogel's employment. The termination letter explained its reasons for doing so, noting, among other things, the following. In a "conflict of interest" document signed in December 2010, Gogel had agreed not to solicit or influence other employees to make claims against Kia nor to malign the company in any way to other employees. Notwithstanding that agreement, as well as Gogel's independent job responsibilities, credible reports indicated that Gogel met with Ledbetter concerning the possible filing of a claim, yet Gogel never notified Kia of this potential action, as her job duties required her to do. Indeed, the investigation indicated that Gogel had "encouraged or even solicited the filing of the charge." Moreover, although multiple people had observed "numerous, lengthy private conferences with [] Ledbetter during the last two-three months," Gogel had denied to Kia officials "any significant recent interaction with [Ledbetter]." Finally, "[a]t the very least, there is an appearance

of a conflict of interest sufficient to cause [Kia] to lose confidence in the loyalty and trust that is required by [Gogel's] position."

After she filed her lawsuit, Gogel finally acknowledged that she had conferred with Ledbetter about the latter's potential filing of a charge against Kia. Indeed, Gogel has now admitted that she confided in Ledbetter that she, Gogel, did not trust the people at Kia to deal with her concerns and that Gogel was going to seek outside assistance (i.e., an attorney). Gogel further testified that she provided Ledbetter with the name of the attorney she had chosen: the same attorney who ultimately assisted both Gogel and Ledbetter in the filing of their charges.

In an effort to minimize her now-acknowledged interaction with Ledbetter, Gogel nonetheless argues that she did not literally solicit Gogel to sue the company. But this parsing by Gogel aside, what is important is what Kia reasonably believed to be the case when it fired Gogel. We have repeatedly held that in determining whether an employer's adverse action decision based on employee misconduct was made for a legitimate, non-retaliatory reason, one looks to the employer's reasonable beliefs, not to whether the employee was in fact guilty of the alleged misconduct. *See Alvarez v. Royal Atl. Dev.*, *Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("In analyzing issues like this one, we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." (internal quotation marks omitted)); *Elrod v. Sears*, *Roebuck & Co.*,

35

939 F.2d 1466, 1470 (11th Cir. 1991) (emphasizing that the relevant inquiry is not whether the employee was guilty of misconduct but whether the employer in good faith believed the employee had done wrong and whether this belief was the reason for the termination). As we explained in *E.E.O.C. v. Total Systems Services, Inc.*, 221 F.3d 1171 (11th Cir. 2000): "When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice." *Id.* at 1176.

Even ignoring Gogel's present admission that she had conferred with Ledbetter regarding the filing of a suit against the company and accepting her tepid protestation that she did not exactly encourage Ledbetter to file an EEOC charge, Kia nonetheless had a reasonable and good faith belief that Gogel had, in fact, actively solicited Ledbetter to do just that. Kia knew that Ledbetter had filed a lawsuit against it only a month after Gogel had filed her suit and that she had used the same lawyer that Gogel had used. Kia knew that two employees who directly reported to Gogel had witnessed multiple meetings between Gogel, Tyler, and Ledbetter. And Kia knew that Ledbetter had related to one of these employees that she, Tyler, and Gogel were planning together to sue the company and had indicated

36

that Gogel was the leader.  Further, Kia knew that, in contravention of her responsibility to keep Kia apprised of the status of any employee complaint, Gogel had never apprised company officials of Ledbetter's intentions prior to her filing suit.

## II.    Applicable Legal Principles

Given Kia's belief that Gogel had solicited Ledbetter to sue the company and given Gogel's particular job duties, one can understand why Kia might find it untenable to allow Gogel to remain in her position.  Tenable or not, though, Gogel argues she is exempt from any negative consequences for the violations of her job duties because her actions constituted protected conduct under Title VII.  Thus, the determinative question on the retaliation claim asserted in this case is whether Gogel's active solicitation of another employee to file an EEOC charge against Kia constitutes protected conduct under Title VII.  Based on Gogel's position as Kia's Senior Team Relations Manager, and the essential duties required of her in that position, I conclude that it does not.

Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by [Title VII]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  The first part of the provision is known as the

37

"opposition clause" and the second part as the "participation clause." *See Total Sys. Servs., Inc.*, 221 F.3d at 1175 (distinguishing between the "two distinct components" of Title VII's retaliation provision). I agree with the majority that we should examine under the opposition clause the question whether Gogel's act of soliciting Ledbetter to file an EEOC charge is protected.

As set out in the introduction to this dissent, our precedent provides that "opposition-conduct" is not protected when the means by which the employee expresses that opposition "so interferes with the performance" of her job duties "that it renders [her] ineffective in the position for which [she] was employed." *Rosser*, 616 F.2d at 223. Since *Rosser*, this Court has reaffirmed the principle that oppositional conduct that might otherwise be protected can lose that status if the conduct interferes with an employee's performance of her duties or renders her ineffective in her job. As the majority acknowledges, this Court held in *Hamm v. Board of Regents of the State of Florida*, 708 F.2d 647 (11th Cir. 1983) that a plaintiff's activities in opposition to alleged discrimination did not qualify as protected conduct when those activities conflicted with the plaintiff's essential duties as a human resources advisor. The Court in *Hamm* emphasized that the plaintiff had "chose[n] to work outside the framework [her employer] was attempting to establish to deal with discrimination claims" by acting as "an advocate on behalf of individual employees" rather than as a human resources

adviser to her supervisor, as she was hired to do. *Id.* at 654. Consequently, the Court explained, protection under Title VII's opposition clause was unavailable. *See id.*

Similarly, the plaintiff in *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. 1980), an EEO compliance officer for a Georgia public authority who engaged in conduct that might otherwise have constituted protected activity, was fired for, among other things, violating normal reporting procedures and assuming duties beyond his job description. *Id.* at 1326. We rejected the plaintiff's argument that his discharge constituted actionable retaliation. *Id.*

The Fifth Circuit likewise has held—in a case very similar to this one—that a human resources manager's solicitation of lawsuits against her employer was not protected activity because it rendered the manager ineffective in her job. *See Jones v. Flagship Int'l*, 793 F.2d 714 (5th Cir. 1986). In *Jones*, the plaintiff was the company's Manager of Equal Employment Opportunity (EEO) Programs, and her duties included investigating charges of discrimination brought against the company and conciliating such charges, representing the company before various agencies, and preparing an affirmative action plan. *Id.* at 716. At some point, the plaintiff complained to her supervisors about sexual harassment she had experienced, but her grievances were ignored. *Id.* at 716–17. She filed a charge

39

with the EOOC alleging pay discrimination and sexual harassment and was ultimately terminated. Of significance to this case, in the course of filing her own charge, she also solicited another employee to file a charge of sex discrimination. *Id.* at 717. Thereafter, she filed a class action complaint. *Id*. at 718. Discussing the impact of the plaintiff's solicitation of another employee to sue the company, the Fifth Circuit cited *Rosser* for the proposition that even sincere opposition to discriminatory practices under Title VII "may be so disruptive or inappropriate as to fall outside the protections of § 704(a)." *Jones*, 793 F.2d at 728. Further, the court agreed that an employer's right to run its business must be balanced against the rights of an employee to express her grievances and promote her own welfare. *Id*.

Applying the above tests to the facts before it, the Fifth Circuit concluded that the plaintiff's conduct in soliciting or inviting others to join in her claim of discrimination, coupled with her desire to file a class action suit, was not protected conduct and the company's subsequent discharge of the plaintiff on that basis did not constitute retaliation. *Id*.

Our Court has cited the Fifth Circuit's decision in *Jones* with approval.[6] *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 401 (11th Cir.

---

[6] The majority's attempt to distinguish *Jones* is unpersuasive. Like Gogel, Jones had solicited another employee to sue his company. There are some minor factual distinctions: *Jones* was an in-house legal counsel who acted as an EEO manager and who planned to file a class action

1989) (noting that *Jones* is "consistent" with this Court's precedent). Indeed, *Rollins*, which addressed an employee who had been fired after filing multiple discrimination complaints, expanded on the "essential duties" test set out in *Rosser* and *Hamm.* Rollins had compromised none of her essential duties by filing her complaints alleging discrimination. She was a technician, not a human resources manager, and she filed a complaint on only her own behalf. There was no solicitation of other employees to file a complaint, nor would it have been a violation of Rollins's essential duties to solicit other employees as none of her job responsibilities involved working with her superiors to resolve discrimination complaints. Hence, her claim of discriminatory conduct did not conflict with any essential duties of her job nor necessarily render her ineffective as a result of her engaging in this conduct, as set out in the *Rosser* test.

Nevertheless, even though Rollins had violated no essential duties by filing her complaints, we held that Rollins's act of complaining could lose its protected status if she had acted unreasonably in the method by which she complained: "[T]the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable." *Rollins*, at 401. And we

---

lawsuit, while Gogel was a senior human resources manager who had filed her own legal action against the company during the time period she actively solicited another employee to file an EEOC charge. But the governing principle of *Jones*—that opposition conduct is not protected by Title VII when it contravenes an employee's essential job duties—is equally applicable to the factual situation presented here.

determined that the manner in which Rollins leveled her grievances was unreasonable. Specifically, in making her complaints, she "habitually bypassed the chain of command," the "sheer number and frequency of [the] complaints . . . , most of which were plainly spurious, was overwhelming," and she "frequently expressed her complaints in an insubordinate and antagonistic manner." *Id.* at 399 (footnote omitted). Further, in determining reasonableness, we "balanc[e] the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation, and a generally productive work environment." *Id.* "If, under this balancing test, the manner in which the employee complains is found to be unreasonable, it falls outside the protection of the statute; the employee's conduct then may be deemed an independent, legitimate basis for the denial of her promotion." *Id.*

Putting these tests together, an employee's oppositional conduct loses its protection when it so interferes with the performance of the employee's job duties that it renders the employee ineffective in the position for which she was employed. Additionally, even if the oppositional conduct does not interfere with an employee's essential duties, it can still lose its protected status if the method by which the opposition is displayed is unreasonable. For example, complaints made in an unceasingly disruptive, harassing, and insubordinate manner that undermines

42

the ability of others in the workforce to function effectively can be deemed to be unreasonable and thus unprotected.

Applying here the tests set out in the above caselaw, I conclude that in soliciting Ledbetter to file an EEOC charge against Kia, Gogel's action so conflicted with her essential job duties that it rendered her ineffective in her position, and it was therefore not protected activity. Gogel's conduct thus constituted a legitimate basis for her termination.[7] As noted, Gogel's essential job duties as Team Relations Manager included: (1) investigating and making recommendations to Kia concerning the disposition of workplace complaints, including complaints involving alleged discrimination and (2) working to resolve such complaints internally in order to protect Kia from litigation. Jackson testified that he lost all confidence in Gogel's ability to perform those essential duties when he received information suggesting that Gogel had solicited Ledbetter to file an EEOC charge against Kia, and rightly so. As Jackson explained in his testimony,

---

[7] Contrary to the majority's suggestion, the rule I apply does not require a blanket exclusion of human resources employees generally—or even of Gogel, specifically—from the protection of Title VII's retaliation provision. Gogel is entitled to protection from retaliation for the filing of her own EEOC charge under Title VII's participation clause. *See* 42 U.S.C. § 2000e-3(a).

And some of Gogel's other activities might have warranted protection under the opposition clause. For example, Gogel describes in her brief the many times she complained to Jackson about alleged workplace discrimination between 2008 and 2010. Those complaints might have qualified as protected opposition, but Gogel was not subjected to any adverse action on account of them. In fact, as noted, even after years of hearing Gogel's vocal criticism of the workplace environment at Kia and just a month after receiving notice of Gogel's own EEOC charge, Jackson approved paid vacation time for Gogel and also gave her a $12,000 discretionary bonus, telling her that she was doing a good job.

Gogel had been hired and was paid to <u>prevent</u> lawsuits against the company, not to solicit and encourage them. Further, she was required to keep her superiors advised of the status of any ongoing grievance by an employee. Obviously, having never informed the company that Ledbetter (at Gogel's behest) was about to file a charge, Gogel fell short of that duty as well, not to mention that when questioned about her contacts with Ledbetter, Gogel falsely indicated that her only conversations had been about operational matters.

Clearly, Gogel abandoned her responsibility to try to resolve employee complaints without litigation when she did the exact opposite: encouraging another employee to file a discrimination claim. Respectfully, I do not understand how anyone could disagree that this action by Gogel so interfered with the performance of her duties that it rendered her ineffective in the job for which she was hired. In fact, in concluding that Gogel engaged in protected conduct, the majority has offered no disagreement with the above conclusion. Rather, the majority largely ignores the above test, instead focusing only on whether it deems Gogel's conduct reasonable under the circumstances. The majority concludes that Gogel's conduct was reasonable. ("Viewing this record in the light most favorable to Ms. Gogel, we conclude the manner of her opposition was reasonable.") (Maj. Op. at 21)

44

In a nutshell, the majority bases its conclusion on the fact that Gogel had gone through the required reporting procedures to alert the company to Ledbetter's complaint regarding the inter-office affair of a high official and a subordinate, as well as other sexist acts by company officials, but to no avail, as those higher than Gogel in the company took no investigative or corrective action. (*Id.* at 23–24) That being the case, the majority reasons that Gogel thereby shed her obligation to try to help the company avoid litigation, and instead, now transformed into a free agent, Gogel was at liberty to encourage a counterattack by the frustrated employee.

I see many problems with this approach. The first problem is the majority's reliance on *Rollins* to support its position. Because we applied a reasonableness test in *Rollins* to gauge whether that employee's particular manner of opposition remained protected, the majority concludes that *Rollins* gives us an open field to second-guess the reasonableness of an employer's decision to sanction an employee for conduct that contravenes the employee's essential duties. That is not so and that is not what *Rollins* requires.

In *Rollins*, in determining whether the manner of the employee's opposition was reasonable, the Court was actually looking at an act that would otherwise be protected absent the particular manner in which it was performed. That is, in complaining about discriminatory conduct, Rollins's complaints certainly

45

constituted protected conduct. But we concluded that her complaint-filing became abusive and harassing, given the sheer number of frivolous complaints and the insubordinate and antagonistic manner in which she asserted her grievances. Thus, the problem was more her style of complaining, with its attendant impact on the productive functioning of the workplace, rather than the act itself.

But in this case, no one is alleging that, by soliciting Ledbetter's participation in a lawsuit, Gogel was overtly disruptive or harassing. To the contrary, she was not obnoxious; she was secretive about her conduct. In other words, it is not the manner of her actions on which we are focused, but the actions, themselves. And those actions violated her core duties. Even applying the *Rollins* reasonableness test here, the act of soliciting another employee to file a claim—when that action violates an essential duty of an employee's job—is per se unreasonable.

Second, this new gloss that the majority has grafted onto our existing tests seems utterly unworkable to me. Now, whenever a human resources manager urges an employee to sue the company, in contravention of that human resources manager's duties to try to resolve conflicts short of litigation, a reviewing court will have to go behind that action to determine the extent to which the court shares the human resources manager's frustration and disappointment with the company's inadequate response to the complaining employee. But what standard do we use to

46

determine when an employer's response is so inadequate that it permits the human resources manager to flout her essential duties by advocating litigation against the employer? Do we require mock litigation of the complaining employee's grievance to figure out how we might have handled the complaint had we been the employer? If that is so, do we then go through a summary judgment drill as to the putative complaint to gauge its degree of merit? Even under the majority's free-form approach to second-guessing the employer, a frivolous or non-meritorious claim by an employee would surely not justify a human resources manager's decision to ignore her core responsibilities by encouraging the employee to sue. Yet, regardless of whether we decide at the end of this scrutiny that we agree or disagree with the company's response to the complaining employee, it will not change the fact that the plaintiff actually bringing the retaliation claim—the human resources manager who has solicited the legal action—has acted in direct dereliction of her duties to the employer.

In trying to work through this new standard, our problems as a court are nothing in comparison to the landmine that we have now laid for employers. How will an employer know when it can permissibly fire an employee whose putative protected conduct has so interfered with the performance of her duties that it has rendered her ineffective in the job for which she was hired? If Kia is now directed to rehire Gogel, must it, each time it receives a complaint from an employee, make

47

sure that its response meets with Gogel's approval, else otherwise she will be free to take matters into her own hand and urge the employee to sue? Is Gogel now, in effect, the final arbiter of all Kia's employment decisions?

Which brings me to my third problem with the majority's approach. Gogel was not a disinterested human resources manager whose intervention with Ledbetter could be attributed solely to an objective assessment of Ledbetter's grievance. Gogel, along with Tyler, was filing her own lawsuit. It was in Gogel's interest to have as many employees as possible join forces with her: both to increase her leverage against Kia with her own case as well as to vent her animus against Kia. Kia reasonably believed that Gogel had already solicited at least one employee to sue. It thus had grounds for concern that Gogel had already violated her recent agreement not to solicit other employees to sue the company and not to malign the company to other staff members. Under these circumstances, what was Kia reasonably expected to do: keep Gogel on and simply hope for the best? To the contrary, it seems to me that application of a balancing test based on reasonableness results in a conclusion that it was no longer feasible for Kia to allow Gogel to continue in her present role with the company.

In summary, I conclude that Kia reasonably believed that Gogel had solicited another employee to file a claim against it, that this advocacy so violated Gogel's essential duties that it rendered her ineffective in her job, and that this

48

action by Gogel therefore did not constitute protected conduct.  Not constituting

protected conduct, this act provided Kia with a legitimate, non-retaliatory reason

for terminating Gogel.  Accordingly, I would affirm the district court's grant of

summary judgment on the retaliation claim.  I thus respectfully dissent from the

majority's decision to the contrary.